## David W. Child *vs.* City of Boston.

The exclusive control of the construction of common sewers in the city of Boston is vested in the board of aldermen; and the city is not liable for any injury or inconvenience occasioned to private persons by their location or construction, according to the order of that board.

When constructed, they become the property of the city, and the duty of keeping them in order devolves upon the city; and the city is responsible for negligently suffering them to occasion a nuisance to the estates of the citizens whose private drains enter into them, if the nuisance does not result from their original plan of construction, and could be avoided by keeping them in proper condition.

When a sewer was ordered to be constructed with a waste weir discharging into the empty basin of the Back Bay, and was built according to the order, it was the duty of the city, when the flats between the upland and the channel of the basin were filled up and made solid land, to extend the drain through the land thus made, so as to keep an open place of discharge into the basin, the city having the right thus to extend it; and if, by their negligently omitting to do so, after notice, injury is occasioned to the estates of private persons by the overflow of the sewer, the city is answerable in damages.

An indenture conveying to the city of Boston the right forever "to dig, lay and maintain all convenient and necessary sewers or drains from the upland to the channel or deep water within the basin [in the Back Bay] according to law and the common and usual practice for the time being within the city," must be construed to apply not only to the

wants of the city as a private owner of lands in the neighborhood, but also to the sewers for general use which it might be their duty, in their municipal capacity, to construct and maintain.

TORT to recover damages sustained by reason of flooding the basement of the plaintiff's house with drain water.

At the trial in this court, before *Hoar*, J., it appeared that the plaintiff owns a house and a lot of land in Dover Street in Boston, which he holds through mesne conveyances from Edward Tuckerman ; and the estate is a part of the parcel of land described in the tripartite indenture referred to in the opinion, as belonging to said Tuckerman. This estate was formerly drained into the empty basin in the Back Bay, so called, through a sewer built jointly by the city of Boston and Tuckerman. In the year 1850 or 1851, the city of Boston built a common sewer in Tremont Street, extending both northerly and southerly from Dover Street, and also a common sewer connected with the one aforesaid, and running through Dover Street to the South Bay, emptying near the South Boston Bridge in Dover Street, which sewer cut off the former drain of the plaintiff. Ordinarily the only outlet to the sewer in Dover Street was into the South Bay, and at the depth of some feet below high water ; but a waste weir was put into the sewer in Tremont Street, when that sewer was built, which opened into the empty basin in the Back Bay, and through which the water in the sewer would discharge into the empty basin, when the outlet into the South Bay was closed by the tide, and the water in the sewer had risen high enough to reach the waste weir. When this sewer was built, the drain of the plaintiff was connected with it by the city. Sometime subsequently to the building of the sewer in Tremont and Dover Streets, the house of the plaintiff, which had previously been perfectly drained, and never suffered from dampness, was flooded with drain water in the lower story, and has been so flooded several times a year, at different periods of the year, ever since ; which was repeatedly made known to the city officers by the plaintiff. The defendants admitted that the waste weir into the Back Bay was closed up by the Boston Water Power Company at some period before the action was brought, by filling in

against the sewer, and that a part of the damage done to the plaintiff was thus occasioned. The plaintiff waived any claim for damage from any other cause, and contended on the evidence that allowing the waste weir to be closed was, under the circumstances, such negligence on the part of the defendants as entitled him to recover in this action.

The jury returned a verdict for the plaintiff, with $3245.69 damages; and the defendants alleged exceptions to the rulings of the judge, which, with other material facts, are stated in the opinion.

This case was argued in March 1860; in March 1861; and, on a single point, in March 1862.

*J. G. Abbott,* (*J. P. Healy* with him) for the defendants. 1. Generally, for any damages arising from the construction or maintenance of common sewers through public streets, a city is not responsible, except in cases expressly provided by statute. Municipal corporations are charged by law with certain powers, to be exercised at their discretion for the public good. They are a part of the government; and are no more liable to private individuals for a wrong or careless exercise of such powers, than the government itself would be. In the absence of statute provisions, the only remedy for negligence is by indictment. There are many analogous cases. *Mower* v. *Leicester,* 9 Mass. 247. *Tisdale* v. *Norton,* 8 Met. 388. *Brady* v. *Lowell,* 3 Cush. 121. *Russell* v. *Men of Devon,* 2 T. R. 667. *Eastman* v. *Meredith,* 36 N. H. 284. *Hooper* v. *Emery,* 14 Maine, 375. *Reed* v. *Belfast,* 20 Maine, 248. *Sanford* v. *Augusta,* 32 Maine, 536. *Baxter* v. *Winooski Turnpike,* 22 Verm. 123. It is the policy of the law that the exercise of the power of the government in this and many other matters should be delegated to cities and towns; the duty of constructing sewers is imposed and the power conferred by general laws, applicable to all cities and towns alike. *St.* 1841, *c.* 115. But the case does not depend on *St.* 1841. Previously, towns and cities had substantially the same powers. *Boston* v. *Shaw,* 1 Met. 130. This case differs, therefore, from cases in which the liability of municipal corporations has been put on the ground of a special grant of power, accepted and

exercised upon the implied condition that all parties should be indemnified against any injury arising from any neglect to perform the duties growing out of such grant. *Bailey* v. *Mayor, &c. of New York,* 3 Hill, (N. Y.) 531. *Goshen & Sharon Turnpike Co.* v *Sears,* 7 Conn. 86. *Riddle* v. *Proprietors of Locks & Canals,* 7 Mass. 187. It differs also from cases in which municipal corporations have been held liable for private injuries carelessly inflicted by them in the course of the execution of public works. Nobody would contend that a city is liable to a private individual for entirely neglecting to exercise the duty of making a drain. How can it be liable for neglecting to maintain that which it would not be liable for omitting to construct at all?

2. The injury sued for in this action was caused by the act of another party, namely, the Water Power Company, and the city is not liable for it. The mere fact that the city did not interfere to prevent the doings of the Water Power Company on their own premises does not make them liable for the acts of that corporation. *Peck* v. *Ellsworth,* 36 Maine, 393. *Green* v *Portland,* 32 Maine, 431.

3. The indenture gave the city no right to discharge the water from the waste weir into the empty basin. The sewer in question was not for the convenience of the lands released by that indenture to the city; it did not extend from the upland to the channel; it was constructed through public streets, for the public convenience. The drains contemplated by the contract were in the nature of private ones, for the benefit of the city as owners of the land thereby released to them. Nor did this right exist in the city as a board of health. The aldermen never adjudged that the drain should be kept open forever. When the drain was built, the Back Bay was all open. They adjudged that, under these circumstances, while the empty basin existed, there might be an outlet into the basin. This was the whole extent of their adjudication. When that space was filled up, a new adjudication was necessary by those having the power and responsibility at that time.

It is not contended that any part of the structure of the sewer, as originally made, was out of repair. The reason why it did

not continue to work successfully was, because circumstances over which the defendants had no power had changed so that the plan would no longer work well. But the report of Messrs. Chesbrough and Parrott contemplated that the waste weir would be obstructed in the very way in which it turns out to have been obstructed; and that then some new plan would have to be adopted. The original plan clearly did not contemplate the extension of drains from the waste weir, but contemplated the adoption of a new plan; as pumping, or raising the grade of the streets. This is also apparent from the fact that an exact estimate of the necessary amount of materials to carry out the plan was reported. The very term "waste weir" excludes the supposition of extended drains.

The defendants could not object to the filling up of the empty basin by the Water Power Company. When the latter exercised their rights, the sewer no longer worked well, and this rendered the plan at first adopted no longer a good and useful one, and private individuals were injured. The damages sustained were in consequence of the defect in the plan; the system was retained after it was no longer useful.

No new sewer could be built, except upon the action of the aldermen. "The law and the common and usual practice for the time being, within the city," required a preliminary order from that body. If the city are held liable, it is because the board of aldermen have not, under their power to do so if they think the public good demands it, built a new drain, extending about half a mile, and to be increased indefinitely, to remedy the defects in the plan of a sewer which had before been built by them, and which had become faulty by the exercise of the legal rights of others. The obstruction was not a temporary one. The only remedy was by building a new sewer.

*P. W. Chandler & G. O. Shattuck*, for the plaintiff. 1. An action on the case lies against municipal corporations, when, in the execution of powers conferred upon them or in the performance of duties required of them by law, their agents perform their acts so carelessly, unskilfully or improperly as to cause damage to others. *Thayer* v. *Boston*, 19 Pick. 511. *Anthony* v. *Adams*,

1 Met. 284. *Perry* v. *Worcester*, 6 Gray, 544. *Proprietors of Locks & Canals* v. *Lowell*, 7 Gray, 223. It has always been the law in England that corporations, established for public purposes, are responsible to individuals for injuries received in consequence of the neglect of their agents to perform their public duties. *Mayor of Lynn* v. *Turner*, Cowp. 86. *Mayor, &c. of Lyme Regis* v. *Henley*, 1 Bing. N. C. 222, 235. *Scott* v. *Mayor, &c. of Manchester*, 1 Hurlst. & Norm. 59, and 37 Eng. Law & Eq. R. 495. The case of *Russell* v. *Men of Devon*, 2 T. R. 667, was decided on the ground that the defendants were not a corporation or *quasi* corporation for the purpose of repairing the highway. Counties and parishes in England are not corporations, like our towns, and cannot raise money and are not liable, as corporations, to repair ways. 1 Bl. Com. 357. In Massachusetts, it is different. Anc. Chart. 267. *St.* 1786, *c.* 81.

In laying, maintaining and repairing drains, the defendants act under a grant of special powers voluntarily accepted, and not under powers held by them as one of the political divisions of the country. Highways are open to all, and the duty of repairing them is in the nature of a political duty. But, until the city charter, and *St.* 1841, *c.* 115, private citizens might construct common sewers. Anc. Chart. 651. *St.* 1796, *c.* 47. By accepting *St.* 1841, *c.* 115, the defendants acquired the power to make all common sewers, and to assess parties benefited for the expense. This power might with equal propriety have been granted to a private corporation, and the defendants are liable to the same extent that a private corporation would have been. *Eastman* v. *Meredith*, 36 N. H. 288. *Lloyd* v. *Mayor, &c. of New York*, 1 Selden, 374. *Mayor, &c. of New York* v. *Furze*, 3 Hill, (N. Y.) 610, 612. *Bailey* v. *Mayor, &c. of New York*, Ib. 531. *Wilson* v. *Mayor, &c. of New York*, 1 Denio, 595. *Rochester White Lead Co.* v. *Rochester*, 3 Comst. 463. *Camden* v. *Mulford*, 2 Dutcher, (N. J.) 49. *Lacour* v. *Mayor, &c. of New York*, 3 Duer, 406. *Storrs* v. *Utica*, 17 N. Y. 104. *Delmonico* v. *Mayor, &c. of New York*, 1 Sandf. 222. The principle which would exonerate the defendants from responsibility is applied only to cases where duties are imposed on all towns without their

corporate assent, and exclusively for public purposes; and not to cases like the present, where the statute was not to take effect in any town unless accepted by it. *Bigelow* v. *Randolph*, 14 Gray, 541. *Ruck* v. *Williams*, 3 Hurlst. & Norm. 318. *Gibbs* v. *Trustees of Liverpool Docks*, Ib. 164. *Ward* v. *Lee*, 7 El. & Bl. 426. *Conrad* v. *Ithaca*, 16 N. Y. 159. *Weet* v. *Brockport*, Ib. 161, *note*.

2. The duty of repairing the drain, when once built, and while used by the city as a common sewer, is ministerial. The statute may be construed as imposing on the city, after its acceptance, the duty of providing proper drainage in all cases. *Mayor, &c. of New York* v. *Furze, ubi supra*. Or, if any judicial discretion is to be exercised by the aldermen, it is clear that the statute contemplates but one adjudication. Adjudicating that the drain should be "laid and made" involved an adjudication to maintain and repair it. The title to it, when constructed, vested in the city. *St.* 1841, *c.* 115, § 1. The city cannot allow its property to become a nuisance, without incurring liability to the parties injured. See cases above cited.

3. The defendants had a right to keep open the outlet of the drain into the Back Bay, and it was their duty to do so. Their right to do so rests upon two grounds: (a.) Under general principles of law, acting as a board of health, they have very large powers, the exercise of which seriously affects the rights of citizens. See City Charter of Boston, *St.* 1821, *c.* 110. *Baker* v. *Boston*, 12 Pick. 192. *Boston* v. *Shaw*, 1 Met. 130. *Mayor, &c. of New York* v. *Furze*, 3 Hill, (N. Y.) 612. *Boston* v. *Lecraw*, 17 How. (U. S.) 426. *Sts.* 1814, *c.* 39, § 5; 1833, *c.* 17, § 11; 1844, *c.* 58; 1853, *c.* 344. *Commonwealth* v. *Alger*, 7 Cush. 85. *Commonwealth* v. *Tewksbury*, 11 Met. 55. (b.) The defendants had this right by virtue of owning the soil, and by special contract; and this not only for private, but for public uses and purposes.

4. In reference to the ground taken in defence, that the original adjudication of the board of aldermen provided for the keeping open of the waste weir only so long as the Back Bay should be kept open, the report of the commissioners must be

construed in the light of all the circumstances. Other commis-
sioners and engineers had made reports, and this report con-
tained not only a plan, but arguments. The theories of the
commissioners were no part of the adjudication. If the second
clause quoted from the report is to be taken as a part of the
adjudication, it must be construed as an order to resort to
pumping, when the wasting of the water into the Back Bay
could no longer be continued. But it cannot, in any event, be
assumed that the board of aldermen contemplated an unlawful
filling up and obstruction of these drains. Neither the Water
Power Company, nor any other party, has to this day any right
to obstruct any drain opening into the Back Bay. It has been
expressly provided in every act of legislation and in every con-
tract respecting the filling up of the Back Bay that until certain
things have been done, which have not yet been done, these
drains shall not be obstructed.

HOAR, J. This case has been three times argued, and has
received from the court that full consideration to which it is
entitled, not only from the large interests involved, but from the
intrinsic difficulty of the questions which it presents.

The common sewer into which the plaintiff's drain entered,
and from which the water was set back upon his land, was con-
structed by the city of Boston, under an order of the mayor and
aldermen, passed on the 8th of July 1850. The right and duty
to make, maintain and repair common sewers, were given by *St*
1841, *c.* 115 ; and the sixth section of the act provided that it
should not take effect in any city, until it should have been
accepted by the mayor and aldermen and common council
thereof. The act was accepted by the city council of Boston,
April 5, 1841.

The order of the mayor and aldermen required that the sewer
should be constructed in conformity with a plan of drainage for
the southwestern portion of the city, reported in City Document
No. 14 of the year 1850, by Messrs. Chesbrough and Parrott ;
and it appears from that report that the drainage of that local-
ity presented peculiar difficulties. The grade of Dover Street,
upon which the plaintiff's house stood, was below the level of

the sea at high water; and any drainage from it into the sea was therefore impossible, except at low stages of the tide. The plan adopted was, to furnish the outlet of the sewer with a flap or gate, which would open to allow the discharge of water at low tide, but which the rising tide would close, and thus prevent the reflux of the salt water. And it was supposed that the capacity of the lower part of the sewer, near the outlet, would be sufficient to contain all that would be required to pass into it from private drains, and from the street gutters, under ordinary circumstances, until the ebb of the tide would allow its discharge into the sea. But whenever heavy rains or melting snows should suddenly increase very much the quantity of water flowing into the sewer, at a stage of the tide when the outlet was closed by the gate, it was obviously necessary to take some other measures to prevent the overflow from the sewer through the private drains into the houses, cellars and yards of the abutters upon the street. With this view, the report of Messrs. Chesbrough and Parrott contained a suggestion to the following effect: " In order to guard the basements and back-yards of these houses from inundation by heavy rains during high tides, it will be necessary to have one or more waste weirs, discharging from the main on Tremont Street into the empty basin, and placed at such a level as to act only when the sewers are filled to overflowing, either from heavy rains, or from the flaps getting out of order and letting in the tide. Should the empty basin ever become covered with houses and streets, this plan of wasting surplus water into it could not be continued. In that case, we see no practical remedy except pumping, for preventing the inundation of the basements and back-yards of houses in the lowest parts of the district, should heavy rains occur during high tide; unless, indeed, the streets are raised high enough above the tide to turn the water in that direction, either by surface or underground drainage."

This was the particular method proposed; and it was in conformity with the fifth recommendation of the report, " for affording a permanent and safe system of drainage," which was as follows: " That the low portions of the district, which are already

improved, be protected, as far as possible, from inundation, by such temporary expedients as are practicable, until a judicious plan of raising them to the height proposed can be adopted and carried out."

The commissioners in another part of their report expressly state that they " are not prepared to recommend a resort to pumping ; " and the result of the whole scheme was therefore this : To adopt the plan of a waste weir into the empty basin as a temporary expedient, so long as drainage in that direction should continue practicable ; and as a last resource, to require a raising of the grade of the street, and of the lands adjoining, to such an extent as to admit a more perfect drainage by discharge into the sea.

The jury were instructed at the trial that the city had the right, under the tripartite indenture between the City of Boston, Edward Tuckerman and others, and the Boston and Roxbury Mill Corporation, to maintain the waste weir, and drain through it into the empty basin ; and we think this instruction was correct. The language of that instrument conferred a very broad and comprehensive right, under a covenant in these terms: " The said Boston and Roxbury Mill Corporation does hereby covenant, grant and agree that the said parties of the first and second part, their respective successors, heirs and assigns, shall have and enjoy forever the right to dig, lay and maintain all convenient and necessary sewers or drains from the upland to the channel or deep water within the basin, according to law and the common and usual practice for the time being within the city." This was clearly intended and must be construed to apply, not only to the wants of the city as a private owner of lands in the neighborhood, but also to the sewers for general use which it might be their duty, in their municipal capacity, to construct and maintain.

The report of Messrs. Chesbrough and Parrott contained a plan of the sewers which they recommended, and a full specification of the kind and amount of materials necessary to their construction ; and the sewer in Dover Street was completed in precise conformity therewith. No defect or want of repair in

the sewer itself has been discovered since it was completed; but the obstruction which caused the injury of which the plaintiff complains was occasioned by the filling up of the flats owned by the Boston Water Power Company between the mouth of the waste weir and the channel of the empty basin, and the failure to extend the sewer through the solid land thus created.

The question whether the defendants are liable at all for the condition of the sewer, and if so, upon what grounds, is one certainly not free from difficulty. It was built, not by their direction, as a municipal corporation, but by the order of the mayor and aldermen, who act upon many subjects as an independent board of public officers, intrusted with a large discretion, and appointed by law to exercise an absolute and exclusive control upon matters within their jurisdiction. The statute provides that the mayor and aldermen may lay, make, maintain and repair all main drains or common sewers in the city. The city ordinance requires all particular drains which enter a common sewer, to be laid under the direction of the board of aldermen, and to be built of such materials as they shall direct. All the main drains and common sewers are made the property of the city or town in which they are built, and the cost of their construction and repair is to be assessed upon the owners of lands benefited by them, except such proportion as by by-law, ordinance or otherwise may be required to be paid by the city or town, which in Boston is to be not less than one quarter part.

Upon mature deliberation, we are all of opinion that the defendants are not responsible for any defect or want of efficiency in the plan of drainage adopted, although it might expose the plaintiff to incidental inconvenience. If the plaintiff chose to build his house below the level of the sea at high water, it was manifestly impossible that the discharge of drains into the sea should be at all times perfect and unobstructed. The duties of the aldermen in determining what drains should be built, and where they should discharge, were of a *quasi* judicial nature, involving the exercise of a large discretion, and depending upon

considerations affecting the public health and general conven
ience. They were required to act, not as agents of the city, or
in any manner under the direction of the city, but as public
officers. If, in the exercise of their judgment, it appeared to
them best that the sewer should be built wholly above the level
of tide water, the private drains which were required to enter
into it must of course be placed at a corresponding elevation,
and it would follow as a necessary consequence that the grade
of the cellars and yards adjacent must be raised to the like
extent, or that drainage could only be allowed from the upper
part of the houses.

But after a common sewer is built, and until some change in
its location or construction is directed by the board of aldermen,
its care and maintenance devolve wholly upon the city, who
provide for keeping it in order through such agents and officers
as they choose to select and appoint. The superintendent of
common sewers, the officer designated for this purpose in the
city of Boston, is chosen by the concurrent vote of the two
branches of the city council, is removable at their pleasure, and
receives such compensation as they determine. City Ordinances
of Boston, (ed. of 1856,) 487. The sewer is the property of the
city, and no private person has any power to interfere with it.
The abutters pay such sums as are assessed upon them for its
construction, and the benefit which they receive from it is the
only return for this contribution. The charge of sewers and
drains is not an obligation imposed upon the city by legislative
authority, exclusively for public purposes, and without its cor-
porate assent. It was voluntarily assumed, by the acceptance
of the act conferring the power.

These circumstances seem to the court to distinguish this
case from the class of cases in which it has been held that a
private action cannot be maintained against a city or town,
unless such an action is expressly given by statute, for negli-
gence in the discharge of a public duty, the performance of
which is required of all such corporations alike. *Mower* v.
*Leicester*, 9 Mass. 247. *Bigelow* v. *Randolph*, 14 Gray, 541.
Here a special authority was conferred and accepted, involving

important relations to individual proprietors of land, and entire control of an easement of such a nature, that negligence might not only deprive those interested of a benefit which it was designed to afford, and for which they had paid, but produce consequences actively and directly pernicious. The duty to keep the sewer free from obstructions was a ministerial duty, and the defendants were liable for negligence in its exercise to any person to whom their negligence occasioned an injury. *Mayor, &c. of New York* v. *Furze,* 3 Hill, (N. Y.) 616. *Wilson* v. *Mayor, &c. of New York,* 1 Denio, 395. *Eastman* v. *Meredith,* 36 N. H. 284, and cases there cited.

This brings us to the last question for decision, which is, perhaps, the most doubtful which the case presents. The injury to the plaintiff was caused, not by any defect in the sewer as originally built, nor by any want of repair; but by an obstruction at the mouth of the waste weir, filling up the place of discharge, and thus effectually closing the orifice through which, in times of freshet, the surplus water was designed to flow. It is argued for the defendants that this does not come within the just limits of their responsibility; that if they built the sewer in conformity with the order of the board of aldermen, kept it in repair, and free from internal obstruction, they could not be answerable for the filling up, by another party, of the part of the basin where the sewer emptied; and that what was needed to remedy the difficulty was in fact an extension of the sewer, which they could not be required to undertake, until the board of aldermen had made an adjudication upon its necessity, and directed it to be built. It was in reference to this position, which is certainly plausible, that the last re-argument of the case was ordered. But, upon examination, we do not think it can be supported.

In determining what it was incumbent on the city to do, in the construction and maintenance of this sewer, regard must be had to all the circumstances existing at the time when the order was passed under which it was built. The city knew that the Boston Water Power Company owned some flats between Tremont Street and the channel of the empty basin, and that they

were likely to fill them up. This appears from the report of the committee of the aldermen, in pursuance of which the order to build the sewer was adopted. That committee say : " At this very moment, some of the principal sewers in the vicinity of Dover Street are obstructed by the earth which has been thrown into the empty basin, under the direction of the Water Power Company, on the westerly side of the Tremont Road, in order to bring their property into use, and their contents are fast creating a grievous nuisance by permeating through it." This was one of the chief evils which the plan of drainage recommended was intended to obviate. The committee further say, that the sewers which they propose " will be self-acting, effective and undoubtedly sufficient for the entire house and surface drainage. Whatever inconveniences might be apprehended from the sudden flowing in of back water, have been provided for by flaps at the outlets, and a waste weir on the empty basin." It is obvious from these statements that the plan contemplated an effective discharge from the waste weir into the channel or deep water of the empty basin ; to be carried through any intervening obstruction, and only to cease or to require a new provision or adjudication of the board of aldermen, when the territory of the basin should be substantially covered with houses and streets. It is true that the report of the engineers contained an estimate of the materials necessary to complete the sewer ; and that the committee of the board of mayor and aldermen, in November 1850, reported that it was completed. City Document, 1850, No. 34. But with the liability to have the flats filled up at the outlet, and the right of the city to extend its drains through them, when thus filled, we think the original order of the mayor and aldermen to construct the sewer upon the plan proposed, must be construed as requiring it to be made continuously effective for the discharge of water into the basin ; and that if not extended at first as far as the Water Power Company had a right to fill, that was to be regarded as a temporary omission, for the sake of present economy ; but which left the obligation upon the city, as the owner of the sewer, and charged with its maintenance, to keep it in operation and open

to the edge of the upland, as the gradual changes in the shore might from time to time require. This being comprehended in the order first passed, no new order or direction was necessary to give it binding force.

As the instructions given to the jury at the trial were correct, the plaintiff is entitled to judgment. It will be sufficiently apparent from the observations already made, that the court do not intend to intimate, that, if the board of aldermen had passed an order directing the waste weir to be closed, the defendants would have incurred any liability, or would have been bound to compensate the abutters upon Dover Street for the expense of raising the grade of their cellars and yards, which such a change in the system of drainage might render indispensable. But while that system remained unchanged, we are of opinion that they were liable for damages occasioned by negligence such as the present action discloses.

*Judgment for the plaintiff on the verdict.*