OWEN *v.* CITY OF INDEPENDENCE, MISSOURI, ET AL.

No. 78–1779.   Argued January 8, 1980—Decided April 16, 1980

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and STEWART and REHNQUIST, JJ., joined, *post*, p. 658.

*Irving Achtenberg* argued the cause for petitioner. With him on the briefs was *David Achtenberg*.

*Richard G. Carlisle* argued the cause and filed a brief for respondents.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

*Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), overruled *Monroe* v. *Pape*, 365 U. S. 167 (1961), insofar as *Monroe* held that local governments were not among the "persons" to whom 42 U. S. C. § 1983 applies and were therefore wholly immune from suit under the statute.[1] *Monell* reserved decision, however, on the question whether local governments, although not entitled to an absolute immunity, should be afforded some form of official immunity in § 1983 suits. 436 U. S., at 701. In this action brought by petitioner in the District Court for the Western District of Missouri, the Court of Appeals for the Eighth Circuit held that respondent city of Independence, Mo., "is entitled to qualified immunity from liability" based on the good faith

---

*Briefs of *amici curiae* urging reversal were filed by *Bruce J. Ennis, Oscar G. Chase*, and *Nancy Stearns* for the American Civil Liberties Union et al.; and by *Michael H. Gottesman, Robert M. Weinberg, David Rubin, William E. Caldwell, John B. Jones, Jr., Norman Redlich, William L. Robinson*, and *Norman Chachkin* for the National Education Association et al.

[1] Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

of its officials: "We extend the limited immunity the district court applied to the individual defendants to cover the City as well, because its officials acted in good faith and without malice." 589 F. 2d 335, 337–338 (1978). We granted certiorari. 444 U. S. 822 (1979). We reverse.

I

The events giving rise to this suit are detailed in the District Court's findings of fact, 421 F. Supp. 1110 (1976). On February 20, 1967, Robert L. Broucek, then City Manager of respondent city of Independence, Mo., appointed petitioner George D. Owen to an indefinite term as Chief of Police.[2] In 1972, Owen and a new City Manager, Lyle W. Alberg, engaged in a dispute over petitioner's administration of the Police Department's property room. In March of that year, a handgun, which the records of the Department's property room stated had been destroyed, turned up in Kansas City in the possession of a felon. This discovery prompted Alberg to initiate an investigation of the management of the property room. Although the probe was initially directed by petitioner, Alberg soon transferred responsibility for the investigation to the city's Department of Law, instructing the City Counselor to supervise its conduct and to inform him directly of its findings.

Sometime in early April 1972, Alberg received a written report on the investigation's progress, along with copies of confidential witness statements. Although the City Auditor found that the Police Department's records were insufficient to permit an adequate accounting of the goods contained in the property room, the City Counselor concluded that there was no evidence of any criminal acts or of any violation of

[2] Under § 3.3 (1) of the city's charter, the City Manager has sole authority to "[a]ppoint, and when deemed necessary for the good of the service, lay off, suspend, demote, or remove all directors, or heads, of administrative departments and all other administrative officers and employees of the city. . . ."

state or municipal law in the administration of the property room. Alberg discussed the results of the investigation at an informal meeting with several City Council members and advised them that he would take action at an appropriate time to correct any problems in the administration of the Police Department.

On April 10, Alberg asked petitioner to resign as Chief of Police and to accept another position within the Department, citing dissatisfaction with the manner in which petitioner had managed the Department, particularly his inadequate supervision of the property room. Alberg warned that if petitioner refused to take another position in the Department his employment would be terminated, to which petitioner responded that he did not intend to resign.

On April 13, Alberg issued a public statement addressed to the Mayor and the City Council concerning the results of the investigation. After referring to "discrepancies" found in the administration, handling, and security of public property, the release concluded that "[t]here appears to be no evidence to substantiate any allegations of a criminal nature" and offered assurances that "[s]teps have been initiated on an administrative level to correct these discrepancies." *Id.*, at 1115. Although Alberg apparently had decided by this time to replace petitioner as Police Chief, he took no formal action to that end and left for a brief vacation without informing the City Council of his decision.[3]

While Alberg was away on the weekend of April 15 and 16, two developments occurred. Petitioner, having consulted with counsel, sent Alberg a letter demanding written notice of the charges against him and a public hearing with a reason-

---

[3] Alberg returned from his vacation on the morning of April 17, and immediately met informally with four members of the City Council. Although the investigation of the Police Department was discussed, and although Alberg testified that he had found a replacement for petitioner by that time, he did not inform the Council members of his intention to discharge petitioner.

able opportunity to respond to those charges.[4]   At approximately the same time, City Councilman Paul L. Roberts asked for a copy of the investigative report on the Police Department property room.   Although petitioner's appeal received no immediate response, the Acting City Manager complied with Roberts' request and supplied him with the audit report and witness statements.

On the evening of April 17, 1972, the City Council held its regularly scheduled meeting.   After completion of the planned agenda, Councilman Roberts read a statement he had prepared on the investigation.[5]   Among other allegations,

---

[4] The letter, dated April 15, 1972, stated in part:

"My counsel . . . have advised me that even though the City Charter may give you authority to relieve me, they also say you cannot do so without granting me my constitutional rights of due process, which includes a written charge and specifications, together with a right to a public hearing and to be represented by counsel and to cross-examine those who may appear against me.

.      .      .      .

"In spite of your recent investigation and your public statement given to the public press, your relief and discharge of me without a full public hearing upon written charges will leave in the minds of the public and those who might desire to have my services, a stigma of personal wrongdoing on my part.

"Such action by you would be in violation of my civil rights as granted by the Constitution and Congress of the United States and you would be liable in damages to me.   Further it would be in violation of the Missouri Administrative Procedure Act.

"May I have an expression from you that you do not intend to relieve me or in the alternative give me a written charge and specifications of your basis for your grounds of intention to relieve me and to grant me a public hearing with a reasonable opportunity to respond to the charge and a right to be represented by counsel."

City Manager Alberg stated that he did not receive the letter until after petitioner's discharge.

[5] Roberts' statement, which is reproduced in full in 421 F. Supp. 1110, 1116, n. 2 (1976), in part recited:

"On April 2, 1972, the City Council was notified of the existence of an investigative report concerning the activities of the Chief of Police of the

Roberts charged that petitioner had misappropriated Police Department property for his own use, that narcotics and money had "mysteriously disappeared" from his office, that traffic tickets had been manipulated, that high ranking police officials had made "inappropriate" requests affecting the police court, and that "things have occurred causing the unusual release of felons." At the close of his statement, Roberts moved that the investigative reports be released to the news media and turned over to the prosecutor for presentation to the grand jury, and that the City Manager "take all direct

City of Independence, certain police officers and activities of one or more other City officials. On Saturday, April 15th for the first time I was able to see these 27 voluminous reports. The contents of these reports are astoundingly shocking and virtually unbelievable. They deal with the disappearance of 2 or more television sets from the police department and signed statement that they were taken by the Chief of Police for his own personal use.

"The reports show that numerous firearms properly in the police department custody found their way into the hands of others including undesirables and were later found by other law enforcement agencies.

"Reports whow [sic] that narcotics held by the Independence Missouri Chief of Police have mysteriously disappeared. Reports also indicate money has mysteriously disappeared. Reports show that traffic tickets have been manipulated. The reports show inappropriate requests affecting the police court have come from high ranking police officials. Reports indicate that things have occurred causing the unusual release of felons. The reports show gross inefficiencies on the part of a few of the high ranking officers of the police department.

"In view of the contents of these reports, I feel that the information in the reports backed up by signed statements taken by investigators is so bad that the council should immediately make available to the news media access to copies of all of these 27 voluminous investigative reports so the public can be told what has been going on in Independence. I further believe that copies of these reports should be turned over and referred to the prosecuting attorney of Jackson County, Missouri for consideration and presentation to the next Grand Jury. I further insist that the City Manager immediately take direct and appropriate action, permitted under the Charter, against such persons as are shown by the investigation to have been involved."

and appropriate action" against those persons "involved in illegal, wrongful, or gross inefficient activities brought out in the investigative reports." After some discussion, the City Council passed Roberts' motion with no dissents and one abstention.[6]

City Manager Alberg discharged petitioner the very next day. Petitioner was not given any reason for his dismissal; he received only a written notice stating that his employment as Chief of Police was "[t]erminated under the provisions of Section 3.3 (1) of the City Charter.".[7] Petitioner's earlier demand for a specification of charges and a public hearing was ignored, and a subsequent request by his attorney for an appeal of the discharge decision was denied by the city on the grounds that "there is no appellate procedure or forum provided by the Charter or ordinances of the City of Independence, Missouri, relating to the dismissal of Mr. Owen." App. 26–27.

The local press gave prominent coverage both to the City Council's action and petitioner's dismissal, linking the discharge to the investigation.[8] As instructed by the City Council, Alberg referred the investigative reports and witness statements to the Prosecuting Attorney of Jackson County, Mo.,

---

[6] Ironically, the official minutes of the City Council meeting indicate that concern was expressed by some members about possible adverse legal consequences that could flow from their release of the reports to the media. The City Counselor assured the Council that although an action might be maintained against any witnesses who made unfounded accusations, "the City does have governmental immunity in this area . . . and neither the Council nor the City as a municipal corporation can be held liable for libelous slander." App. 20–23.

[7] See n. 2, supra.

[8] The investigation and its culmination in petitioner's firing received front-page attention in the local press. See, e. g., "Lid Off Probe, Council Seeks Action," Independence Examiner, Apr. 18, 1972, Tr. 24–25; "Independence Accusation. Police Probe Demanded," Kansas City Times, Apr. 18, 1972, Tr. 25; "Probe Culminates in Chief's Dismissal," Independence Examiner, Apr. 19, 1972, Tr. 26; "Police Probe Continues; Chief Ousted," Community Observer, Apr. 20, 1972, Tr. 26.

for consideration by a grand jury. The results of the audit and investigation were never released to the public, however. The grand jury subsequently returned a "no true bill," and no further action was taken by either the City Council or City Manager Alberg.

## II

Petitioner named the city of Independence, City Manager Alberg, and the present members of the City Council in their official capacities as defendants in this suit.[9] Alleging that he was discharged without notice of reasons and without a hearing in violation of his constitutional rights to procedural and substantive due process, petitioner sought declaratory and injunctive relief, including a hearing on his discharge, back-pay from the date of discharge, and attorney's fees. The District Court, after a bench trial, entered judgment for respondents. 421 F. Supp. 1110 (1976).[10]

---

[9] Petitioner did not join former Councilman Roberts in the instant litigation. A separate action seeking defamation damages was brought in state court against Roberts and Alberg in their individual capacities. Petitioner dismissed the state suit against Alberg and reached a financial settlement with Roberts. See 560 F. 2d 925, 930 (CA8 1977).

[10] The District Court, relying on *Monroe* v. *Pape*, 365 U. S. 167 (1961), and *City of Kenosha* v. *Bruno*, 412 U. S. 507 (1973), held that § 1983 did not create a cause of action against the city, but that petitioner could base his claim for relief directly on the Fourteenth Amendment. On the merits, however, the court determined that petitioner's discharge did not deprive him of any constitutionally protected property interest because, as an untenured employee, he possessed neither a contractual nor a *de facto* right to continued employment as Chief of Police. Similarly, the court found that the circumstances of petitioner's dismissal did not impose a stigma of illegal or immoral conduct on his professional reputation, and hence did not deprive him of any liberty interest.

The District Court offered three reasons to support its conclusion: First, because the actual discharge notice stated only that petitioner was "[t]erminated under the provisions of Section 3.3 (1) of the City Charter," nothing in his official record imputed any stigmatizing conduct to him. Second, the court found that the City Council's actions had no causal connection to petitioner's discharge, for City Manager Alberg had apparently

The Court of Appeals initially reversed the District Court. 560 F. 2d 925 (1977).[11] Although it agreed with the District Court that under Missouri law petitioner possessed no property interest in continued employment as Police Chief, the Court of Appeals concluded that the city's allegedly false public accusations had blackened petitioner's name and reputation, thus depriving him of liberty without due process of law. That the stigmatizing charges did not come from the City Manager and were not included in the official discharge notice was, in the court's view, immaterial. What was im-

made his decision to hire a new Police Chief before the Council's April 17th meeting. Lastly, the District Court determined that petitioner was "completely exonerated" from any charges of illegal or immoral conduct by the City Counselor's investigative report, Alberg's public statements, and the grand jury's return of a "no true bill." 421 F. Supp., at 1121–1122.

As an alternative ground for denying relief, the District Court ruled that the city was entitled to assert, and had in fact established, a qualified immunity against liability based on the good faith of the individual defendants who acted as its agents: "[D]efendants have clearly shown by a preponderance of the evidence that neither they, nor their predecessors, were aware in April 1972, that, under the circumstances, the Fourteenth Amendment accorded plaintiff the procedural rights of notice and a hearing at the time of his discharge. Defendants have further proven that they cannot reasonably be charged with constructive notice of such rights since plaintiff was discharged prior to the publication of the Supreme Court decisions in *Roth* v. *Board of Regents,* [408 U. S. 564 (1972)], and *Perry* v. *Sindermann,* [408 U. S. 593 (1972)]." *Id.,* at 1123.

[11] Both parties had appealed from the District Court's decision. On respondents' challenge to the court's assumption of subject-matter jurisdiction under 28 U. S. C. § 1331, the Court of Appeals held that the city was subject to suit for reinstatement and backpay under an implied right of action arising directly from the Fourteenth Amendment. 560 F. 2d, at 932–934. See *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971). Because the Court of Appeals concluded that petitioner's claim could rest directly on the Fourteenth Amendment, it saw no need to decide whether he could recover backpay under § 1983 from the individual defendants in their official capacities as part of general equitable relief, even though the award would be paid by the city. 560 F. 2d, at 932.

portant, the court explained, was that "the official actions of the city council released charges against [petitioner] contemporaneous and, in the eyes of the public, connected with that discharge." *Id.*, at 937.[12]

Respondents petitioned for review of the Court of Appeals' decision. Certiorari was granted, and the case was remanded for further consideration in light of our supervening decision in *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978). 438 U. S. 902 (1978). The Court of Ap-

---

[12] As compensation for the denial of his constitutional rights, the Court of Appeals awarded petitioner damages in lieu of backpay. The court explained that petitioner's termination without a hearing must be considered a nullity, and that ordinarily he ought to remain on the payroll and receive wages until a hearing is held and a proper determination on his retention is made. But because petitioner had reached the mandatory retirement age during the course of the litigation, he could not be reinstated to his former position. Thus the compensatory award was to be measured by the amount of money petitioner would likely have earned to retirement had he not been deprived of his good name by the city's actions, subject to mitigation by the amounts actually earned, as well as by the recovery from Councilman Roberts in the state defamation suit.

The Court of Appeals rejected the municipality's assertion of a good-faith defense, relying upon a footnote in *Wood* v. *Strickland,* 420 U. S. 308, 314–315, n. 6 (1975) ("immunity from damages does not ordinarily bar equitable relief as well"), and two of its own precedents awarding backpay in § 1983 actions against school boards. See *Wellner* v. *Minnesota State Jr. College Bd.,* 487 F. 2d 153 (CA8 1973); *Cooley* v. *Board of Educ. of Forrest City School Dist.,* 453 F. 2d 282 (CA8 1972). The court concluded that the primary justification for a qualified immunity—the fear that public officials might hesitate to discharge their duties if faced with the prospect of personal monetary liability—simply did not exist where the relief would be borne by a governmental unit rather than the individual officeholder. In addition, the Court of Appeals seemed to take issue with the District Court's finding of good faith on the part of the City Council: "The city officials may have acted in good faith in refusing the hearing, but lack of good faith is evidenced by the nature of the unfair attack made upon the appellant by Roberts in the official conduct of the City's business. The District Court did not address the good faith defense in light of Roberts' defamatory remarks." 560 F. 2d, at 941.

peals on the remand reaffirmed its original determination that the city had violated petitioner's rights under the Fourteenth Amendment, but held that all respondents, including the city, were entitled to qualified immunity from liability. 589 F. 2d 335 (1978).

*Monell* held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U. S., at 694. The Court of Appeals held in the instant case that the municipality's official policy was responsible for the deprivation of petitioner's constitutional rights: "[T]he stigma attached to [petitioner] in connection with his discharge was caused by the official conduct of the City's lawmakers, or by those whose acts may fairly be said to represent official policy. Such conduct amounted to official policy causing the infringement of [petitioner's] constitutional rights, in violation of section 1983." 589 F. 2d, at 337.[13]

---

[13] Although respondents did not cross petition on this issue, they have raised a belated challenge to the Court of Appeals' ruling that petitioner was deprived of a protected "liberty" interest. See Brief for Respondents 45–46. We find no merit in their contention, however, and decline to disturb the determination of the court below.

*Wisconsin* v. *Constantineau,* 400 U. S. 433, 437 (1971), held that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." In *Board of Regents* v. *Roth,* 408 U. S. 564, 573 (1972), we explained that the dismissal of a government employee accompanied by a "charge against him that might seriously damage his standing and associations in his community" would qualify as something "the government is doing to him," so as to trigger the due process right to a hearing at which the employee could refute the charges and publicly clear his name. In the present case, the city—through the unanimous resolution of the City Council—released to the public an allegedly false statement impugning petitioner's honesty and integrity. Petitioner was discharged

Nevertheless, the Court of Appeals affirmed the judgment of the District Court denying petitioner any relief against the respondent city, stating:

> "The Supreme Court's decisions in *Board of Regents* v. *Roth*, 408 U. S. 564 . . . (1972), and *Perry* v. *Sindermann*, 408 U. S. 593 . . . (1972), crystallized the rule establishing the right to a name-clearing hearing for a government employee allegedly stigmatized in the course of his discharge. The Court decided those two cases two months after the discharge in the instant case. Thus, officials of the City of Independence could not have been aware of [petitioner's] right to a name-clearing hearing in connection with the discharge. The City of Independence should not be charged with predicting the future course of constitutional law. We extend the limited immunity the district court applied to the individual defendants to cover the City as well, because its officials acted in good faith and without malice. We hold the City not liable for actions it could not reasonably have known violated [petitioner's] constitutional rights." *Id.,* at 338 (footnote and citations omitted).[14]

_____

the next day. The Council's accusations received extensive coverage in the press, and even if they did not in point of fact "cause" petitioner's discharge, the defamatory and stigmatizing charges certainly "occur[red] in the course of the termination of employment." Cf. *Paul* v. *Davis*, 424 U. S. 693, 710 (1976). Yet the city twice refused petitioner's request that he be given written specification of the charges against him and an opportunity to clear his name. Under the circumstances, we have no doubt that the Court of Appeals correctly concluded that the city's actions deprived petitioner of liberty without due process of law.

[14] Cf. *Wood* v. *Strickland*, 420 U. S. 308, 322 (1975) ("Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student").

We turn now to the reasons for our disagreement with this holding.[15]

### III

Because the question of the scope of a municipality's immunity from liability under § 1983 is essentially one of statutory construction, see *Wood* v. *Strickland,* 420 U. S. 308, 314, 316 (1975); *Tenney* v. *Brandhove,* 341 U. S. 367, 376 (1951), the starting point in our analysis must be the language of the statute itself. *Andrus* v. *Allard,* 444 U. S. 51, 56 (1979); *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring). By its terms, § 1983 "creates a species of tort liability that on its face admits of no immunities." *Imbler* v. *Pachtman,* 424 U. S. 409, 417 (1976). Its language is absolute and unqualified; no mention is made of any privileges, immunities, or defenses that may be asserted. Rather, the Act imposes liability upon *"every person"* who, under color of state law or custom, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." [16] And *Monell* held that these words were intended to encompass municipal corporations as well as natural "persons."

Moreover, the congressional debates surrounding the passage of § 1 of the Civil Rights Act of 1871, 17 Stat. 13—the forerunner of § 1983—confirm the expansive sweep of the stat-

---

[15] The Courts of Appeals are divided on the question whether local governmental units are entitled to a qualified immunity based on the good faith of their officials. Compare *Bertot* v. *School Dist. No. 1,* 613 F. 2d 245 (CA10 1979) (en banc), *Hostrop* v. *Board of Junior College Dist. No. 515,* 523 F. 2d 569 (CA7 1975), and *Hander* v. *San Jacinto Jr. College,* 519 F. 2d 273 (CA5), rehearing denied, 522 F. 2d 204 (1975), all refusing to extend a qualified immunity to the governmental entity, with *Paxman* v. *Campbell,* 612 F. 2d 848 (CA4 1980) (en banc), and *Sala* v. *County of Suffolk,* 604 F. 2d 207 (CA2 1979), granting defendants a "good-faith" immunity.

[16] See n. 1, *supra.*

utory language.  Representative Shellabarger, the author and manager of the bill in the House, explained in his introductory remarks the breadth of construction that the Act was to receive:

> "I have a single remark to make in regard to the rule of interpretation of those provisions of the Constitution under which all the sections of the bill are framed.  This act is remedial, and in aid of the preservation of human liberty and human rights.  All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed.  It would be most strange and, in civilized law, monstrous were this not the rule of interpretation.  As has been again and again decided by your own Supreme Court of the United States, and everywhere else where there is wise judicial interpretation, the largest latitude consistent with the words employed is uniformly given in construing such statutes and constitutional provisions as are meant to protect and defend and give remedies for their wrongs to all the people."  Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871) (hereinafter Globe App.).

Similar views of the Act's broad remedy for violations of federally protected rights were voiced by its supporters in both Houses of Congress.  See *Monell* v. *New York City Dept. of Social Services,* 436 U. S., at 683–687.[17]

---

[17] As we noted in *Monell* v. *New York City Dept. of Social Services,* see 436 U. S., at 685–686, n. 45, even the opponents of § 1 acknowledged that its language conferred upon the federal courts the entire power that Congress possessed to remedy constitutional violations.  The remarks of Senator Thurman are illustrative:

"[This section's] whole effect is to give to the Federal Judiciary that which now does not belong to it—a jurisdiction that may be constitutionally conferred upon it, I grant, but that has never yet been conferred upon it.  It authorizes any person who is deprived of any right, privilege, or immunity secured to him by the Constitution of the United States, to bring an action

However, notwithstanding § 1983's expansive language and the absence of any express incorporation of common-law immunities, we have, on several occasions, found that a tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that "Congress would have specifically so provided had it wished to abolish the doctrine." *Pierson* v. *Ray*, 386 U. S. 547, 555 (1967). Thus in *Tenney* v. *Brandhove, supra,* after tracing the development of an absolute legislative privilege from its source in 16th-century England to its inclusion in the Federal and State Constitutions, we concluded that Congress "would [not] impinge on a tradition so well grounded in history and reason by covert inclusion in the general language" of § 1983. 341 U. S., at 376.

Subsequent cases have required that we consider the personal liability of various other types of government officials. Noting that "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction," *Pierson* v. *Ray, supra,* at 553–554, held that the absolute immunity traditionally accorded judges was preserved under § 1983. In that same case, local police officers were held to enjoy a "good faith and probable cause" defense to § 1983 suits similar to that which existed in false arrest actions at common law. 386 U. S., at 555–557. Several more recent decisions have found immunities of varying scope appropriate for different state and local officials sued under § 1983. See *Procunier* v. *Navarette*, 434 U. S. 555 (1978) (qualified im-

---

against the wrong-doer in the Federal courts, and that without any limit whatsoever as to the amount in controversy. . . .

. . . . .

". . . That is the language of this bill. Whether it is the intent or not I know not, but it is the language of the bill; for there is no limitation whatsoever upon the terms that are employed, and they are as comprehensive as can be used." Globe App. 216–217.

munity for prison officials and officers); *Imbler* v. *Pachtman,* 424 U. S. 409 (1976) (absolute immunity for prosecutors in initiating and presenting the State's case); *O'Connor* v. *Donaldson,* 422 U. S. 563 (1975) (qualified immunity for superintendent of state hospital); *Wood* v. *Strickland,* 420 U. S. 308 (1975) (qualified immunity for local school board members); *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974) (qualified "good-faith" immunity for state Governor and other executive officers for discretionary acts performed in the course of official conduct).

In each of these cases, our finding of § 1983 immunity "was predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Imbler* v. *Pachtman, supra,* at 421. Where the immunity claimed by the defendant was well established at common law at the time § 1983 was enacted, and where its rationale was compatible with the purposes of the Civil Rights Act, we have construed the statute to incorporate that immunity. But there is no tradition of immunity for municipal corporations, and neither history nor policy supports a construction of § 1983 that would justify the qualified immunity accorded the city of Independence by the Court of Appeals. We hold, therefore, that the municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983.[18]

### A

Since colonial times, a distinct feature of our Nation's system of governance has been the conferral of political power upon public and municipal corporations for the management of matters of local concern. As *Monell* recounted, by 1871,

---

[18] The governmental immunity at issue in the present case differs significantly from the official immunities involved in our previous decisions. In those cases, various government officers had been sued in their individual capacities, and the immunity served to insulate them from personal liability for damages. Here, in contrast, only the liability of the municipality itself is at issue, not that of its officers, and in the absence of an immunity, any recovery would come from public funds.

municipalities—like private corporations—were treated as natural persons for virtually all purposes of constitutional and statutory analysis. In particular, they were routinely sued in both federal and state courts. See 436 U. S., at 687–688. Cf. *Cowles* v. *Mercer County,* 7 Wall. 118 (1869). Local governmental units were regularly held to answer in damages for a wide range of statutory and constitutional violations, as well as for common-law actions for breach of contract.[19] And although, as we discuss below,[20] a municipal-

---

[19] Primary among the constitutional suits heard in federal court were those based on a municipality's violation of the Contract Clause, and the courts' enforcement efforts often included "various forms of 'positive' relief, such as ordering that taxes be levied and collected to discharge federal-court judgments, once a constitutional infraction was found." *Monell* v. *New York City Dept. of Social Services,* 436 U. S., at 681. Damages actions against municipalities for federal statutory violations were also entertained. See, e. g., *Levy Court* v. *Coroner,* 2 Wall. 501 (1865); *Corporation of New York* v. *Ransom,* 23 How. 487 (1860); *Bliss* v. *Brooklyn,* 3 F. Cas. 706 (No. 1,544) (CC EDNY 1871). In addition, state constitutions and statutes, as well as municipal charters, imposed many obligations upon the local governments, the violation of which typically gave rise to damages actions against the city. See generally Note, Streets, Change of Grade, Liability of Cities for, 30 Am. St. Rep. 835 (1893), and cases cited therein. With respect to authorized contracts—and even unauthorized contracts that are later ratified by the corporation—municipalities were liable in the same manner as individuals for their breaches. See generally 1 J. Dillon, Law of Municipal Corporations §§ 385, 394 (2d ed. 1873) (hereinafter Dillon). Of particular relevance to the instant case, included within the class of contract actions brought against a city were those for the wrongful discharge of a municipal employee, and where the claim was adjudged meritorious, damages in the nature of backpay were regularly awarded. See, e. g., *Richardson* v. *School Dist. No. 10,* 38 Vt. 602 (1866); *Paul* v. *School Dist. No. 2,* 28 Vt. 575 (1856); *Inhabitants of Searsmont* v. *Farwell,* 3 Me. \*450 (1825); see generally F. Burke, A Treatise on the Law of Public Schools 81–85 (1880). The most frequently litigated "breach of contract" suits, however, at least in federal court, were those for failure to pay interest on municipal bonds. See, e. g., *The Supervisors* v. *Durant,* 9 Wall. 415 (1870); *Commissioners of Knox County* v. *Aspinwall,* 21 How. 539 (1859).

[20] See *infra,* at 644–650.

ity was not subject to suit for all manner of tortious conduct, it is clear that at the time § 1983 was enacted, local governmental bodies did not enjoy the sort of "good-faith" qualified immunity extended to them by the Court of Appeals.

As a general rule, it was understood that a municipality's tort liability in damages was identical to that of private corporations and individuals:

> "There is nothing in the character of a municipal corporation which entitles it to an immunity from liability for such malfeasances as private corporations or individuals would be liable for in a civil action. A municipal corporation is liable to the same extent as an individual for any act done by the express authority of the corporation, or of a branch of its government, empowered to act for it upon the subject to which the particular act relates, and for any act which, after it has been done, has been lawfully ratified by the corporation." T. Shearman & A. Redfield, A Treatise on the Law of Negligence § 120, p. 139 (1869) (hereinafter Shearman & Redfield).

Accord, 2 Dillon § 764, at 875 ("But as respects *municipal corporations proper*, . . . it is, we think, universally considered, even in the absence of statute giving the action, that they are liable for acts of *misfeasance* positively injurious to individuals, done by their authorized agents or officers, in the course of the performance of corporate powers constitutionally conferred, or in the execution of corporate duties") (emphasis in original). See 18 E. McQuillin, Municipal Corporations § 53.02 (3d rev. ed. 1977) (hereinafter McQuillin). Under this general theory of liability, a municipality was deemed responsible for any private losses generated through a wide variety of its operations and functions, from personal injuries due to its defective sewers, thoroughfares, and public utilities, to property damage caused by its trespasses and uncompensated takings.[21]

---

[21] See generally C. Rhyne, Municipal Law 729–789 (1957); Shearman &

Yet in the hundreds of cases from that era awarding damages against municipal governments for wrongs committed by them, one searches in vain for much mention of a qualified immunity based on the good faith of municipal officers. Indeed, where the issue was discussed at all, the courts had rejected the proposition that a municipality should be privileged where it reasonably believed its actions to be lawful. In the leading case of *Thayer* v. *Boston,* 36 Mass. 511, 515–516 (1837), for example, Chief Justice Shaw explained:

> "There is a large class of cases, in which the rights of both the public and of individuals may be deeply involved, in which it cannot be known at the time the act is done, whether it is lawful or not. The event of a legal inquiry, in a court of justice, may show that it was unlawful. Still, if it was not known and understood to be unlawful at the time, if it was an act done by the officers having competent authority, either by express vote of the city government, or by the nature of the duties and functions with which they are charged, by their offices, to act upon the general subject matter, and especially if the act was done with an honest view to obtain for the public some lawful benefit or advantage, reason and justice obviously require that the city, in its corporate capacity, should be liable to make good the damage sustained by an individual, in consequence of the acts thus done."

The *Thayer* principle was later reiterated by courts in several jurisdictions, and numerous decisions awarded damages against municipalities for violations expressly found to have been committed in good faith. See, *e. g., Town Council of Akron* v. *McComb,* 18 Ohio 229, 230–231 (1849); *Horton* v. *Inhabitants of Ipswich,* 66 Mass. 488, 489, 492 (1853); *Elliot* v. *Concord,* 27 N. H. 204 (1853); *Hurley* v. *Town of Texas,* 20 Wis. 634, 637–638 (1866); *Lee* v. *Village of Sandy Hill,* 40 N. Y.

---

Redfield §§ 143–152; W. Williams, Liability of Municipal Corporations for Tort (1901) (hereinafter Williams).

442, 448–451 (1869); *Billings* v. *Worcester*, 102 Mass. 329, 332–333 (1869); *Squiers* v. *Village of Neenah*, 24 Wis. 588, 593 (1869); *Hawks* v. *Charlemont*, 107 Mass. 414, 417–418 (1871).[22]

That municipal corporations were commonly held liable for damages in tort was also recognized by the 42d Congress. See *Monell* v. *New York City Dept. of Social Services*, 436 U. S., at 688. For example, Senator Stevenson, in opposing the Sherman amendment's creation of a municipal liability for the riotous acts of its inhabitants, stated the prevailing law: "Numberless cases are to be found where a statutory liability has been created against municipal corporations for injuries resulting from a neglect of corporate duty." Cong.

---

[22] Accord, *Bunker* v. *City of Hudson*, 122 Wis. 43, 54, 99 N. W. 448, 452 (1904); *Oklahoma City* v. *Hill Bros.*, 6 Okla. 114, 137–139, 50 P. 242, 249–250 (1897); *Schussler* v. *Board of Comm'rs of Hennepin County*, 67 Minn. 412, 417, 70 N. W. 6, 7 (1897); *McGraw* v. *Town of Marion*, 98 Ky. 673, 680–683, 34 S. W. 18, 20–21 (1896). See generally Note, Liability of Cities for the Negligence and Other Misconduct of their Officers and Agents, 30 Am. St. Rep. 376, 405–411 (1893).

Even in England, where the doctrine of official immunity followed by the American courts was first established, no immunity was granted where the damages award was to come from the public treasury. As Baron Bramwell stated in *Ruck* v. *Williams*, 3 H. & N. 308, 320, 157 Eng. Rep. 488, 493 (Exch. 1858):

"I can well understand if a person undertakes the office or duty of a Commissioner, and there are no means of indemnifying him against the consequences of a slip, it is reasonable to hold that he should not be responsible for it. I can also understand that, if one of several Commissioners does something not within the scope of his authority, the Commissioners as a body are not liable. But where Commissioners, who are a quasi corporate body, are not affected [*i. e.*, personally] by the result of an action, inasmuch as they are authorized by act of parliament to raise a fund for payment of the damages, on what principle is it that, if an individual member of the public suffers from an act bona fide but erroneously done, he is not to be compensated? It seems to me inconsistent with actual justice, and not warranted by any principle of law."

See generally Shearman & Redfield §§ 133, 178.

Globe, 42d Cong., 1st Sess., 762 (hereinafter Globe).[23]   No-
where in the debates, however, is there a suggestion that the
common law excused a city from liability on account of the
good faith of its authorized agents, much less an indication
of a congressional intent to incorporate such an immunity
into the Civil Rights Act.[24]   The absence of any allusion to a
municipal immunity assumes added significance in light of
the objections raised by the opponents of § 1 of the Act that
its unqualified language could be interpreted to abolish the
traditional good-faith immunities enjoyed by legislators,
judges, governors, sheriffs, and other public officers.[25]   Had

_____

[23] Senator Stevenson proceeded to read from the decision in *Prather* v.
*Lexington,* 52 Ky. 559, 560–562 (1852):

"Where a particular act, operating injuriously to an individual, is
authorized by a municipal corporation, by a delegation of power either
general or special, it will be liable for the injury in its corporate capacity,
where the acts done would warrant a like action against an individual.
But as a general rule a corporation is not responsible for the unauthorized
and unlawful acts of its officers, although done under the color of their
office; to render it liable it must appear that it expressly authorized the
acts to be done by them, or that they were done in pursuance of a general
authority to act for the corporation, on the subject to which they relate.
(*Thayer* v. *Boston,* 19 Pick., 511.)   It has also been held that cities are
responsible to the same extent, and in the same manner, as natural persons
for injuries occasioned by the negligence or unskillfulness of their agents
in the construction of works for their benefit."   Globe 762.

[24] At one point in the debates, Senator Stevenson did protest that the
Sherman amendment would, for the first time, "create a corporate liability
for personal injury which no prudence or foresight could have prevented."
*Ibid.*   As his later remarks made clear, however, Stevenson's objection
went only to the novelty of the amendment's creation of vicarious munici-
pal liability for the unlawful acts of private individuals, "even if a munici-
pality did not know of an impending or ensuing riot or did not have the
wherewithal to do anything about it."   *Monell* v. *New York City Dept.
of Social Services,* 436 U. S., at 692–693, n. 57.

[25] See, e. g., Globe 365 (remarks of Rep. Arthur) ("But if the Legisla-
ture enacts a law, if the Governor enforces it, if the judge upon the bench
renders a judgment, if the sheriff levy an execution, execute a writ, serve
a summons, or make an arrest, all acting under a solemn, official oath,

there been a similar common-law immunity for municipalities, the bill's opponents doubtless would have raised the specter of its destruction, as well.

To be sure, there were two doctrines that afforded municipal corporations some measure of protection from tort liability. The first sought to distinguish between a municipality's "governmental" and "proprietary" functions; as to the former, the city was held immune, whereas in its exercise of the latter, the city was held to the same standards of liability as any private corporation. The second doctrine immunized a municipality for its "discretionary" or "legislative" activities, but not for those which were "ministerial" in nature. A brief examination of the application and the rationale underlying each of these doctrines demonstrates that Congress could not have intended them to limit a municipality's liability under § 1983.

The governmental-proprietary distinction [26] owed its existence to the dual nature of the municipal corporation. On

---

though as pure in duty as a saint and as immaculate as a seraph, for a mere error in judgment, they are liable. . ."); *id.*, at 385 (remarks of Rep. Lewis); Globe App. 217 (remarks of Sen. Thurman).

[26] In actuality, the distinction between a municipality's governmental and proprietary functions is better characterized not as a line, but as a succession of points. In efforts to avoid the often-harsh results occasioned by a literal application of the test, courts frequently created highly artificial and elusive distinctions of their own. The result was that the very same activity might be considered "governmental" in one jurisdiction, and "proprietary" in another. See 18 McQuillin § 53.02, at 105. See also W. Prosser, Law of Torts § 131, p. 979 (4th ed. 1971) (hereinafter Prosser). As this Court stated, in reference to the " 'nongovernmental'-'governmental' quagmire that has long plagued the law of municipal corporations":

"A comparative study of the cases in the forty-eight States will disclose an irreconcilable conflict. More than that, the decisions in each of the States are disharmonious and disclose the inevitable chaos when courts try to apply a rule of law that is inherently unsound." *Indian Towing Co.* v. *United States,* 350 U. S. 61, 65 (1955) (on rehearing).

the one hand, the municipality was a corporate body, capable of performing the same "proprietary" functions as any private corporation, and liable for its torts in the same manner and to the same extent, as well. On the other hand, the municipality was an arm of the State, and when acting in that "governmental" or "public" capacity, it shared the immunity traditionally accorded the sovereign.[27] But the principle of sovereign immunity—itself a somewhat arid fountainhead for municipal immunity [28]—is necessarily nullified when the

---

[27] "While acting in their governmental capacity, municipal corporations proper are given the benefit of that same rule which is applied to the sovereign power itself, and are afforded complete immunity from civil responsibility for acts done or omitted, unless such responsibility is expressly created by statute. When, however, they are not acting in the exercise of their purely governmental functions, but are performing duties that pertain to the exercise of those private franchises, powers, and privileges which belong to them for their own corporate benefit, or are dealing with property held by them for their own corporate gain or emolument, then a different rule of liability is applied and they are generally held responsible for injuries arising from their negligent acts or their omissions to the same extent as a private corporation under like circumstances." Williams § 4, at 9. See generally 18 McQuillin §§ 53.02, 53.04, 53.24; Prosser § 131, at 977–983; James, Tort Liability of Governmental Units and Their Officers, 22 U. Chi. L. Rev. 610, 611–612, 622–629 (1955).

[28] Although it has never been understood how the doctrine of sovereign immunity came to be adopted in the American democracy, it apparently stems from the personal immunity of the English Monarch as expressed in the maxim, "The King can do no wrong." It has been suggested, however, that the meaning traditionally ascribed to this phrase is an ironic perversion of its original intent: "The maxim merely meant that the King was not privileged to do wrong. If his acts were against the law, they were *injuriae* (wrongs). Bracton, while ambiguous in his several statements as to the relation between the King and the law, did not intend to convey the idea that he was incapable of committing a legal wrong." Borchard, Government Liability in Tort, 34 Yale L. J. 1, 2, n. 2 (1924). See also Kates & Kouba, Liability of Public Entities Under Section 1983 of the Civil Rights Act, 45 S. Cal. L. Rev. 131, 142 (1972).

In this country, "[t]he sovereign or governmental immunity doctrine, holding that the state, its subdivisions and municipal entities, may not be

State expressly or impliedly allows itself, or its creation, to be sued. Municipalities were therefore liable not only for their "proprietary" acts, but also for those "governmental" functions as to which the State had withdrawn their immunity. And, by the end of the 19th century, courts regularly held that in imposing a specific duty on the municipality either in its charter or by statute, the State had impliedly withdrawn the city's immunity from liability for the nonperformance or misperformance of its obligation. See, *e. g.*, *Weightman* v. *The Corporation of Washington,* 1 Black 39, 50–52 (1862); *Providence* v. *Clapp,* 17 How. 161, 167–169 (1855). See generally Shearman & Redfield §§ 122–126; Note, Liability of Cities for the Negligence and Other Misconduct of their Officers and Agents, 30 Am. St. Rep. 376, 385 (1893). Thus, despite the nominal existence of an immunity for "governmental" functions, municipalities were found

---

held liable for tortious acts, was never completely accepted by the courts, its underlying principle being deemed contrary to the basic concept of the law of torts that liability follows negligence, as well as foreign to the spirit of the constitutional guarantee that every person is entitled to a legal remedy for injuries he may receive in his person or property. As a result, the trend of judicial decisions was always to restrict, rather than to expand, the doctrine of municipal immunity." 18 McQuillin § 53.02, at 104 (footnotes omitted). See also Prosser § 131, at 984 ("For well over a century the immunity of both the state and the local governments for their torts has been subjected to vigorous criticism, which at length has begun to have its effect"). The seminal opinion of the Florida Supreme Court in *Hargrove* v. *Town of Cocoa Beach,* 96 So. 2d 130 (1957), has spawned "a minor avalanche of decisions repudiating municipal immunity," Prosser § 131, at 985, which, in conjunction with legislative abrogation of sovereign immunity, has resulted in the consequence that only a handful of States still cling to the old common-law rule of immunity for governmental functions. See K. Davis, Administrative Law of the Seventies § 25.00 (1976 and Supp. 1977) (only two States adhere to the traditional common-law immunity from torts in the exercise of governmental functions); Harley & Wasinger, Government Immunity: Despotic Mantle or Creature of Necessity, 16 Washburn L. J. 12, 34–53 (1976).

liable in damages in a multitude of cases involving such activities.

That the municipality's common-law immunity for "governmental" functions derives from the principle of sovereign immunity also explains why that doctrine could not have served as the basis for the qualified privilege respondent city claims under § 1983. First, because sovereign immunity insulates the municipality from unconsented suits altogether, the presence or absence of good faith is simply irrelevant. The critical issue is whether injury occurred while the city was exercising governmental, as opposed to proprietary, powers or obligations—not whether its agents reasonably believed they were acting lawfully in so conducting themselves.[29] More fundamentally, however, the municipality's "governmental" immunity is obviously abrogated by the sovereign's enactment of a statute making it amenable to suit. Section 1983 was just such a statute. By including municipalities within the class of "persons" subject to liability for violations of the Federal Constitution and laws, Congress—the supreme sovereign on matters of federal law [30]—abolished whatever ves-

[29] The common-law immunity for governmental functions is thus more comparable to an absolute immunity from liability for conduct of a certain character, which defeats a suit at the outset, than to a qualified immunity, which "depends upon the circumstances and motivations of [the official's] actions, as established by the evidence at trial." *Imbler* v. *Pachtman*, 424 U. S. 409, 419, n. 13 (1976).

[30] Municipal defenses—including an assertion of sovereign immunity— to a federal right of action are, of course, controlled by federal law. See *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 455–456 (1976); *Hampton* v. *Chicago*, 484 F. 2d 602, 607 (CA7 1973) (Stevens, J.) ("Conduct by persons acting under color of state law which is wrongful under 42 U. S. C. § 1983 or § 1985 (3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced").

tige of the State's sovereign immunity the municipality possessed.

The second common-law distinction between municipal functions—that protecting the city from suits challenging "discretionary" decisions—was grounded not on the principle of sovereign immunity, but on a concern for separation of powers. A large part of the municipality's responsibilities involved broad discretionary decisions on issues of public policy—decisions that affected large numbers of persons and called for a delicate balancing of competing considerations. For a court or jury, in the guise of a tort suit, to review the reasonableness of the city's judgment on these matters would be an infringement upon the powers properly vested in a coordinate and coequal branch of government. See *Johnson* v. *State*, 69 Cal. 2d 782, 794, n. 8, 447 P. 2d 352, 361, n. 8 (1968) (en banc) ("Immunity for 'discretionary' activities serves no purpose except to assure that courts refuse to pass judgment on policy decisions in the province of coordinate branches of government"). In order to ensure against any invasion into the legitimate sphere of the municipality's policymaking processes, courts therefore refused to entertain suits against the city "either for the non-exercise of, or for the manner in which in good faith it exercises, *discretionary powers* of a public or legislative character." 2 Dillon § 753, at 862.[31]

Although many, if not all, of a municipality's activities would seem to involve at least some measure of discretion, the influence of this doctrine on the city's liability was not as significant as might be expected. For just as the courts

---

[31] See generally 18 McQuillin § 53.04a; Shearman & Redfield §§ 127–130; Williams § 6, at 15–16. Like the governmental/proprietary distinction, a clear line between the municipality's "discretionary" and "ministerial" functions was often hard to discern, a difficulty which has been mirrored in the federal courts' attempts to draw a similar distinction under the Federal Tort Claims Act, 28 U. S. C. § 2680 (a). See generally 3 K. Davis, Administrative Law Treatise § 25.08 (1958 and Supp. 1970).

implied an exception to the municipality's immunity for its "governmental" functions, here, too, a distinction was made that had the effect of subjecting the city to liability for much of its tortious conduct. While the city retained its immunity for decisions as to whether the public interest required acting in one manner or another, once any particular decision was made, the city was fully liable for any injuries incurred in the execution of its judgment. See, e. g., *Hill* v. *Boston*, 122 Mass. 344, 358–359 (1877) (dicta) (municipality would be immune from liability for damages resulting from its decision where to construct sewers, since that involved a discretionary judgment as to the general public interest; but city would be liable for neglect in the construction or repair of any particular sewer, as such activity is ministerial in nature). See generally C. Rhyne, Municipal Law § 30.4, pp. 736–737 (1957); Williams § 7. Thus municipalities remained liable in damages for a broad range of conduct implementing their discretionary decisions.

Once again, an understanding of the rationale underlying the common-law immunity for "discretionary" functions explains why that doctrine cannot serve as the foundation for a good-faith immunity under § 1983. That common-law doctrine merely prevented courts from substituting their own judgment on matters within the lawful discretion of the municipality. But a municipality has no "discretion" to violate the Federal Constitution; its dictates are absolute and imperative. And when a court passes judgment on the municipality's conduct in a § 1983 action, it does not seek to second-guess the "reasonableness" of the city's decision nor to interfere with the local government's resolution of competing policy considerations. Rather, it looks only to whether the municipality has conformed to the requirements of the Federal Constitution and statutes. As was stated in *Sterling* v. *Constantin*, 287 U. S. 378, 398 (1932): "When there is a substantial showing that the exertion of state power has

overridden private rights secured by that Constitution, the subject is necessarily one for judicial inquiry in an appropriate proceeding directed against the individuals charged with the transgression."

In sum, we can discern no "tradition so well grounded in history and ·reason" that would warrant the conclusion that in enacting § 1 of the Civil Rights Act, the 42d Congress *sub silentio* extended to municipalities a qualified immunity based on the good faith of their officers. Absent any clearer indication that Congress intended so to limit the reach of a statute expressly designed to provide a "broad remedy for violations of federally protected civil rights," *Monell* v. *New York City Dept. of Social Services,* 436 U. S., at 685, we are unwilling to suppose that injuries occasioned by a municipality's unconstitutional conduct were not also meant to be fully redressable through its sweep.[32]

## B

Our rejection of a construction of § 1983 that would accord municipalities a qualified immunity for their good-faith constitutional violations is compelled both by the legislative purpose in enacting the statute and by considerations of public policy. The central aim of the Civil Rights Act was to provide protection to those persons wronged by the " '[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Monroe* v. *Pape,* 365 U. S., at 184 (quoting *United States* v. *Classic,* 313 U. S. 299, 326 (1941)). By creating an express federal remedy, Congress sought to "enforce provisions of the Fourteenth Amendment against those

[32] Cf. P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 336 (2d ed. 1973) ("[W]here constitutional rights are at stake the courts are properly astute, in construing statutes, to avoid the conclusion that Congress intended to use the privilege of immunity . . . in order to defeat them").

who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe* v. *Pape, supra,* at 172.

How "uniquely amiss" it would be, therefore, if the government itself—"the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct"—were permitted to disavow liability for the injury it has begotten. See *Adickes* v. *Kress & Co.,* 398 U. S. 144, 190 (1970) (opinion of BRENNAN, J.). A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed. Yet owing to the qualified immunity enjoyed by most government officials, see *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974), many victims of municipal malfeasance would be left remediless if the city were also allowed to assert a good-faith defense. Unless countervailing considerations counsel otherwise, the injustice of such a result should not be tolerated.[33]

Moreover, § 1983 was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well. See *Robertson* v. *Wegmann,* 436 U. S. 584, 590–591 (1978); *Carey* v. *Piphus,* 435 U. S. 247, 256–257 (1978). The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create

---

[33] The absence of any damages remedy for violations of all but the most "clearly established" constitutional rights, see *Wood* v. *Strickland,* 420 U. S., at 322, could also have the deleterious effect of freezing constitutional law in its current state of development, for without a meaningful remedy aggrieved individuals will have little incentive to seek vindication of those constitutional deprivations that have not previously been clearly defined.

an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights.[34] Furthermore, the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights.[35] Such procedures are particularly beneficial in preventing those "systemic" injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith. Cf. Note, Developments in the Law: Section 1983 and Federalism, 90 Harv. L. Rev. 1133, 1218–1219 (1977).[36]

Our previous decisions conferring qualified immunities on various government officials, see *supra,* at 637–638, are not to

---

[34] For example, given the discussion that preceded the Independence City Council's adoption of the allegedly slanderous resolution impugning petitioner's integrity, see n. 6, *supra,* one must wonder whether this entire litigation would have been necessary had the Council members thought that the city might be liable for their misconduct.

[35] Cf. *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 417–418 (1975): "If employers faced only the prospect of an injunctive order, they would have little incentive to shun practices of dubious legality. It is the reasonably certain prospect of a backpay award that 'provide[s] the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and. to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history.' *United States* v. *N. L. Industries, Inc.,* 479 F. 2d 354, 379 (CA8 1973)."

[36] In addition, the threat of liability against the city ought to increase the attentiveness with which officials at the higher levels of government supervise the conduct of their subordinates. The need to institute system-wide measures in order to increase the vigilance with which otherwise indifferent municipal officials protect citizens' constitutional rights is, of course, particularly acute where the frontline officers are judgment-proof in their individual capacities.

be read as derogating the significance of the societal interest in compensating the innocent victims of governmental misconduct. Rather, in each case we concluded that overriding considerations of public policy nonetheless demanded that the official be given a measure of protection from personal liability. The concerns that justified those decisions, however, are less compelling, if not wholly inapplicable, when the liability of the municipal entity is at issue.[37]

---

[37] On at least two previous occasions, this Court has expressly recognized that different considerations come into play when governmental rather than personal liability is threatened. *Hutto* v. *Finney*, 437 U. S. 678 (1978), affirmed an award of attorney's fees out of state funds for a deprivation of constitutional rights, holding that such an assessment would not contravene the Eleventh Amendment. In response to the suggestion, adopted by the dissent, that any award should be borne by the government officials personally, the Court noted that such an allocation would not only be "manifestly unfair," but would "def[y] this Court's insistence in a related context that imposing personal liability in the absence of bad faith may cause state officers to 'exercise their discretion with undue timidity.' *Wood* v. *Strickland*, 420 U. S. 308, 321." *Id.*, at 699, n. 32. The Court thus acknowledged that imposing personal liability on public officials could have an undue chilling effect on the exercise of their decision-making responsibilities, but that no such pernicious consequences were likely to flow from the possibility of a recovery from public funds.

Our decision in *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U. S. 391 (1979), also recognized that the justifications for immunizing officials from personal liability have little force when suit is brought against the governmental entity itself. Petitioners in that case had sought damages under § 1983 from a regional planning agency and the individual members of its governing agency. Relying on *Tenney* v. *Brandhove*, 341 U. S. 367 (1951), the Court concluded that "to the extent the evidence discloses that these individuals were acting in a capacity comparable to that of members of a state legislature, they are entitled to absolute immunity from federal damages liability." 440 U. S., at 406. At the same time, however, we cautioned: "If the respondents have enacted unconstitutional legislation, there is no reason why relief against TRPA itself should not adequately vindicate petitioners' interests. See *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658." *Id.*, at 405, n. 29.

In *Scheuer* v. *Rhodes, supra,* at 240, THE CHIEF JUSTICE identified the two "mutually dependent rationales" on which the doctrine of official immunity rested:

> "(1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good." [38]

The first consideration is simply not implicated when the damages award comes not from the official's pocket, but from the public treasury. It hardly seems unjust to require a municipal defendant which has violated a citizen's constitutional rights to compensate him for the injury suffered thereby. Indeed, Congress enacted § 1983 precisely to provide a remedy for such abuses of official power. See *Monroe* v. *Pape,* 365 U. S., at 171–172. Elemental notions of fairness dictate that one who causes a loss should bear the loss.

It has been argued, however, that revenue raised by taxation for public use should not be diverted to the benefit of a single or discrete group of taxpayers, particularly where the municipality has at all times acted in good faith. On the contrary, the accepted view is that stated in *Thayer* v. *Boston*—"that the city, in its corporate capacity, should be liable to make good the damage sustained by an [unlucky] indi-

---

[38] *Wood* v. *Strickland,* 420 U. S. 308 (1975), mentioned a third justification for extending a qualified immunity to public officials: the fear that the threat of personal liability might deter citizens from holding public office. See *id.,* at 320 ("The most capable candidates for school board positions might be deterred from seeking office if heavy burdens upon their private resources from monetary liability were a likely prospect during their tenure"). Such fears are totally unwarranted, of course, once the threat of personal liability is eliminated.

vidual, in consequence of the acts thus done." 36 Mass., at 515. After all, it is the public at large which enjoys the benefits of the government's activities, and it is the public at large which is ultimately responsible for its administration. Thus, even where some constitutional development could not have been foreseen by municipal officials, it is fairer to allocate any resulting financial loss to the inevitable costs of government borne by all the taxpayers, than to allow its impact to be felt solely by those whose rights, albeit newly recognized, have been violated. See generally 3 K. Davis, Administrative Law Treatise § 25.17 (1958 and Supp. 1970); Prosser § 131, at 978; Michelman, Property, Utility, and Fairness: Some Thoughts on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165 (1967).[39]

The second rationale mentioned in *Scheuer* also loses its force when it is the municipality, in contrast to the official, whose liability is at issue. At the heart of this justification for a qualified immunity for the individual official is the concern that the threat of *personal* monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process, thus paralyzing the governing official's decisiveness and distorting his judgment on matters

---

[39] *Monell* v. *New York City Dept. of Social Services* indicated that the principle of loss-spreading was an insufficient justification for holding the municipality liable under § 1983 on a *respondeat superior* theory. 436 U. S., at 693–694. Here, of course, quite a different situation is presented. Petitioner does not seek to hold the city responsible for the unconstitutional actions of an individual official *"solely* because it employs a tortfeasor." *Id.*, at 691. Rather, liability is predicated on a determination that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.*, at 690. In this circumstance—when it is the local government itself that is responsible for the constitutional deprivation—it is perfectly reasonable to distribute the loss to the public as a cost of the administration of government, rather than to let the entire burden fall on the injured individual.

of public policy.[40]  The inhibiting effect is significantly reduced, if not eliminated, however, when the threat of personal liability is removed.   First, as an empirical matter, it is questionable whether the hazard of municipal loss will deter a public officer from the conscientious exercise of his duties; city officials routinely make decisions that either require a large expenditure of municipal funds or involve a substantial risk of depleting the public fisc.   See *Kostka* v. *Hogg*, 560 F. 2d 37, 41 (CA1 1977).   More important, though, is the realization that consideration of the *municipality's* liability for constitutional violations is quite properly the concern of its elected or appointed officials.   Indeed, a decisionmaker would be derelict in his duties if, at some point, he did not consider whether his decision comports with constitutional mandates and did not weigh the risk that a violation might result in an award of damages from the public treasury.   As one commentator aptly put it: "Whatever other concerns should shape a particular official's actions, certainly one of them should be the constitutional rights of individuals who will be affected by his actions.   To criticize section 1983 liability because it leads decisionmakers to avoid the infringement of constitutional rights is to criticize one of the statute's *raisons d'être*." [41]

---

[40] "The imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter even the most conscientious school decisionmaker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the school and the students." *Wood* v. *Strickland, supra*, at 319–320.

[41] Note, Developments in the Law: Section 1983 and Federalism, 90 Harv. L. Rev. 1133, 1224 (1977). See also *Johnson* v. *State*, 69 Cal. 2d 782, 792–793, 447 P. 2d 352, 359–360 (1968):

"Nor do we deem an employee's concern over the potential liability of his employer, the governmental unit, a justification for an expansive definition of 'discretionary,' and hence immune, acts.   As a threshold matter, we consider it unlikely that the possibility of government liability will be

## IV

In sum, our decision holding that municipalities have no immunity from damages liability flowing from their constitutional violations harmonizes well with developments in the common law and our own pronouncements on official immunities under § 1983. Doctrines of tort law have changed significantly over the past century, and our notions of governmental responsibility should properly reflect that evolution. No longer is individual "blameworthiness" the acid test of liability; the principle of equitable loss-spreading has joined fault as a factor in distributing the costs of official misconduct.

We believe that today's decision, together with prior precedents in this area, properly allocates these costs among the three principals in the scenario of the § 1983 cause of action: the victim of the constitutional deprivation; the officer whose conduct caused the injury; and the public, as represented by the municipal entity. The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury. The offending official, so long as he conducts himself in good faith, may go about his business secure in the knowledge that a qualified immunity will protect him from personal liability for damages that are more appropriately chargeable to the populace as a whole. And the public will be forced to bear only the costs of injury inflicted by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."

---

a serious deterrent to the fearless exercise of judgment by the employee. In any event, however, to the extent that such a deterrent effect takes hold, it may be wholesome. An employee in a private enterprise naturally gives some consideration to the potential liability of his employer, and this attention unquestionably promotes careful work; the potential liability of a governmental entity, to the extent that it affects primary conduct at all, will similarly influence public employees." (Citation and footnote omitted.)

*Monell* v. *New York City Dept. of Social Services,* 436 U. S., at 694.

*Reversed.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE REHNQUIST join, dissenting.

The Court today holds that the city of Independence may be liable in damages for violating a constitutional right that was unknown when the events in this case occurred. It finds a denial of due process in the city's failure to grant petitioner a hearing to clear his name after he was discharged. But his dismissal involved only the proper exercise of discretionary powers according to prevailing constitutional doctrine. The city imposed no stigma on petitioner that would require a "name clearing" hearing under the Due Process Clause.

On the basis of this alleged deprivation of rights, the Court interprets 42 U. S. C. § 1983 to impose strict liability on municipalities for constitutional violations. This strict liability approach inexplicably departs from this Court's prior decisions under § 1983 and runs counter to the concerns of the 42d Congress when it enacted the statute. The Court's ruling also ignores the vast weight of common-law precedent as well as the current state law of municipal immunity. For these reasons, and because this decision will hamper local governments unnecessarily, I dissent.

I

The Court does not question the District Court's statement of the facts surrounding Owen's dismissal. *Ante,* at 625. It nevertheless rejects the District Court's conclusion that no due process hearing was necessary because "the circumstances of [Owen's] discharge did not impose a stigma of illegal or immoral conduct on his professional reputation." 421 F. Supp. 1110, 1122 (WD Mo. 1976); see *ante,* at 633–634, n. 13.

Careful analysis of the record supports the District Court's view that Owen suffered no constitutional deprivation.

### A

From 1967 to 1972, petitioner Owen served as Chief of the Independence Police Department at the pleasure of the City Manager.[1] Friction between Owen and City Manager Alberg flared openly in early 1972, when charges surfaced that the Police Department's property room was mismanaged. The City Manager initiated a full internal investigation.

In early April, the City Auditor reported that the records in the property room were so sparse that he could not conduct an audit. The City Counselor reported that "there was no evidence of any criminal acts, or violation of any state law or municipal ordinances, in the administration of the property room." 560 F. 2d 925, 928 (CA8 1977). In a telephone call on April 10, the City Manager asked Owen to resign and offered him another position in the Department. The two met on the following day. Alberg expressed his unhappiness over the property room situation and again requested that Owen step down. When Owen refused, the City Manager responded that he would be fired. 421 F. Supp., at 1114–1115.

On April 13, the City Manager asked Lieutenant Cook of the Police Department if he would be willing to take over as Chief. Alberg also released the following statement to the public:

> "At my direction, the City Counselor's office, [i]n conjunction with the City Auditor ha[s] completed a routine audit of the police property room.

---

[1] Under § 3.3 (1) of the Independence City Charter in effect in 1972, the City Manager had the power to "[a]ppoint, and when deemed necessary for the good of the service, lay off, suspend, demote, or remove all directors, or heads, of administrative departments. . . ." Section 3.8 of that Charter stated that the Chief of Police is the "director" of the Police Department. Charter of the City of Independence, Mo. (Dec. 5, 1961) (hereinafter cited as Charter).

"Discrepancies were found in the administration, handling and security of recovered property. There appears to be no evidence to substantiate any allegations of a criminal nature. . . ." 560 F. 2d, at 928–929.

The District Court found that the City Manager decided on Saturday, April 15, to replace Owen with Lieutenant Cook as Chief of Police. 421 F. Supp., at 1115. Before the decision was announced, however, City Council Member Paul Roberts obtained the internal reports on the property room. At the April 17 Council meeting, Roberts read a prepared statement that accused police officials of "gross inefficiencies" and various "inappropriate" actions. *Id.*, at 1116, n. 2. He then moved that the Council release the reports to the public, refer them to the Prosecuting Attorney of Jackson County for presentation to a grand jury, and recommend to the City Manager that he "take all direct and appropriate action permitted under the Charter. . . ." *Ibid.* The Council unanimously approved the resolution.

On April 18, Alberg "implemented his prior decision to discharge [Owen] as Chief of Police." 560 F. 2d, at 929. The notice of termination stated simply that Owen's employment was "[t]erminated under the provisions of Section 3.3 (1) of the City Charter." App. 17. That charter provision grants the City Manager complete authority to remove "directors" of administrative departments "when deemed necessary for the good of the service." Owen's lawyer requested a hearing on his client's termination. The Assistant City Counselor responded that "there is no appellate procedure or forum provided by the Charter or ordinances of the City of Independence, Missouri, relating to the dismissal of Mr. Owen." *Id.*, at 27.

The City Manager referred to the Prosecuting Attorney all reports on the property room. The grand jury returned a "no true bill," and there has been no further official action on the matter. Owen filed a state lawsuit against Councilman

Roberts and City Manager Alberg, asking for damages for libel, slander, and malicious prosecution. Alberg won a dismissal of the state-law claims against him, and Councilman Roberts reached a settlement with Owen.[2]

This federal action was filed in 1976. Owen alleged that he was denied his liberty interest in his professional reputation when he was dismissed without formal charges or a hearing. *Id.*, at 8, 10.[3]

## B

Due process requires a hearing on the discharge of a government employee "if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination. . . ." *Codd* v. *Velger*, 429 U. S. 624, 628 (1977) *(per curiam)*. This principle was first announced in *Board of Regents* v. *Roth*, 408 U. S. 564 (1972), which was decided in June 1972, 10 weeks *after* Owen was discharged. The pivotal question after *Roth* is whether the circumstances of the discharge so blackened the employee's

---

[2] In its answer to Owen's complaint in this action, the city cited the state-court action as *Owen* v. *Roberts and Alberg*, Case No. 778,640 (Jackson County, Mo., Circuit Ct.). App. 15.

[3] Owen initially claimed that his property interests in the job also were violated. The Court of Appeals affirmed the District Court's rejection of that contention, 560 F. 2d 925, 937 (CA8 1977), and petitioner has not challenged that ruling in this Court.

The Court suggests that the city should have presented a cross-petition for certiorari in order to argue that Owen has no cause of action. *Ante,* at 633, n. 13. It is well settled that a respondent "may make any argument presented below that supports the judgment of the lower court." *Hankerson* v. *North Carolina*, 432 U. S. 233, 240, n. 6 (1977); see *Massachusetts Mutual Life Ins. Co.* v. *Ludwig*, 426 U. S. 479, 480–481 (1976), citing *United States* v. *American Railway Express Co.*, 265 U. S. 425, 435 (1924). The judgment of the Court of Appeals in the instant case was to "den[y] Owen any relief . . ." by finding that the defendants were immune from suit. 589 F. 2d 335, 338 (1979). Since the same judgment would result from a finding that Owen has no cause of action under the statute, respondents' failure to present a cross-petition does not prevent them from pressing the issue before this Court.

name as to impair his liberty interest in his professional reputation. *Id.,* at 572–575.

The events surrounding Owen's dismissal "were prominently reported in local newspapers." 560 F. 2d, at 930. Doubtless, the public received a negative impression of Owen's abilities and performance. But a "name clearing" hearing is not necessary unless the employer makes a public statement that "might seriously damage [the employee's] standing and associations in his community." *Board of Regents* v. *Roth, supra,* at 573. No hearing is required after the "discharge of a public employee whose position is terminable at the will of the employer when there is no public disclosure of the reasons for the discharge." *Bishop* v. *Wood,* 426 U. S. 341, 348 (1976).

The City Manager gave no specific reason for dismissing Owen. Instead, he relied on his discretionary authority to discharge top administrators "for the good of the service." Alberg did not suggest that Owen "had been guilty of dishonesty, or immorality." *Board of Regents* v. *Roth, supra,* at 573. Indeed, in his "property room" statement of April 13, Alberg said that there was "no evidence to substantiate any allegations of a criminal nature." This exoneration was reinforced by the grand jury's refusal to initiate a prosecution in the matter. Thus, nothing in the actual firing cast such a stigma on Owen's professional reputation that his liberty was infringed.

The Court does not address directly the question whether any stigma was imposed by the discharge. Rather, it relies on the Court of Appeals' finding that stigma derived from events "connected with" the firing. *Ante,* at 633; 589 F. 2d, at 337. That court attached great significance to the resolution adopted by the City Council at its April 17 meeting. But the resolution merely recommended that Alberg take "appropriate action," and the District Court found no "causal connection" between events in the City Council and the firing of Owen. 421 F. Supp., at 1121. Two days

before the Council met, Alberg already had decided to dismiss Owen. Indeed, Councilman Roberts stated at the meeting that the City Manager had asked for Owen's resignation. *Id.,* at 1116, n. 2.[4]

Even if the Council resolution is viewed as part of the discharge process, Owen has demonstrated no denial of his liberty: Neither the City Manager nor the Council cast any aspersions on Owen's character. Alberg absolved all connected with the property room of any illegal activity, while the Council resolution alleged no wrongdoing. That events focused public attention upon Owen's dismissal is undeniable; such attention is a condition of employment—and of discharge—for high government officials. Nevertheless, nothing in the actions of the City Manager or the City Council triggered a constitutional right to a name-clearing hearing.[5]

The statements by Councilman Roberts were neither measured nor benign, but they provide no basis for this action against the city of Independence. Under *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658, 691 (1978), the city cannot be held liable for Roberts' statements on a theory of *respondeat superior.* That case held that § 1983

---

[4] The City Charter prohibits any involvement of Council members in the City Manager's personnel decisions. Section 2.11 of the Charter states that Council members may not "participate in any manner in the appointment or removal of officers and employees of the city." Violation of § 2.11 is a misdemeanor that may be punished by ejection from office.

[5] The Court suggests somewhat cryptically that stigma was imposed on Owen when "the city—through the unanimous resolution of the City Council—released to the public an allegedly false statement impugning petitioner's honesty and integrity." *Ante,* at 633, n. 13. The Court fails, however, to identify any "allegedly false statement." The resolution did call for public disclosure of the reports on the property room situation, but those reports were never released. *Ante,* at 630. Indeed, petitioner's complaint alleged that the failure to release those reports left "a cloud or suspicion of misconduct" over him. App. 8. The resolution also referred the reports to the prosecutor and called on the City Manager to take appropriate action. Neither event could constitute the public release of an "allegedly false statement" mentioned by the Court.

makes municipalities liable for constitutional deprivations only if the challenged action was taken "pursuant to official municipal policy of some nature. . . ." As the Court noted, "a municipality cannot be held liable *solely* because it employs a tortfeasor. . . ." 436 U. S., at 691 (emphasis in original). The statements of a single councilman scarcely rise to the level of municipal policy.[6]

As the District Court concluded, "[a]t most, the circumstances . . . suggested that, as Chief of Police, [Owen] had been an inefficient administrator." 421 F. Supp., at 1122. This Court now finds unconstitutional stigma in the interaction of unobjectionable official acts with the unauthorized statements of a lone councilman who had no direct role in the discharge process. The notoriety that attended Owen's firing resulted not from any city policy, but solely from public misapprehension of the reasons for a purely discretionary dismissal. There was no constitutional injury; there should be no liability.[7]

## II

Having constructed a constitutional deprivation from the valid exercise of governmental authority, the Court holds that municipalities are strictly liable for their constitutional torts. Until two years ago, municipal corporations enjoyed absolute immunity from § 1983 claims. *Monroe* v. *Pape*, 365 U. S.

---

[6] Roberts himself enjoyed absolute immunity from § 1983 suits for acts taken in his legislative capacity. *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U. S. 391, 402–406 (1979). Owen did sue him in state court for libel and slander, and reached an out-of-court settlement. See *supra*, at 660–661.

[7] This case bears some resemblance to *Martinez* v. *California*, 444 U. S. 277 (1980), which involved a § 1983 suit against state parole officials for injuries caused by a paroled prisoner. We found that the plaintiffs had no cause of action because they could not show a causal relationship between their injuries and the actions of the defendants. 444 U. S., at 285. That relationship also is absent in this case. Any injury to Owen's reputation was the result of the Roberts statement, not the policies of the city of Independence.

167 (1961). But *Monell* v. *New York City Dept. of Social Services, supra,* held that local governments are "persons" within the meaning of the statute, and thus are liable in damages for constitutional violations inflicted by municipal policies. 436 U. S., at 690. *Monell* did not address the question whether municipalities might enjoy a qualified immunity or good-faith defense against § 1983 actions. 436 U. S., at 695, 701; *id.,* at 713–714 (POWELL, J., concurring).

After today's decision, municipalities will have gone in two short years from absolute immunity under § 1983 to strict liability. As a policy matter, I believe that strict municipal liability unreasonably subjects local governments to damages judgments for actions that were reasonable when performed. It converts municipal governance into a hazardous slalom through constitutional obstacles that often are unknown and unknowable.

The Court's decision also impinges seriously on the prerogatives of municipal entities created and regulated primarily by the States. At the very least, this Court should not initiate a federal intrusion of this magnitude in the absence of explicit congressional action. Yet today's decision is supported by nothing in the text of § 1983. Indeed, it conflicts with the apparent intent of the drafters of the statute, with the common law of municipal tort liability, and with the current state law of municipal immunities.

## A

### 1

Section 1983 provides a private right of action against "[e]very person" acting under color of state law who imposes or causes to be imposed a deprivation of constitutional rights.[8]

---

[8] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . ." 42 U. S. C. § 1983.

Although the statute does not refer to immunities, this Court has held that the law "is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler* v. *Pachtman,* 424 U. S. 409, 418 (1976); see *Tenney* v. *Brandhove,* 341 U. S. 367, 376 (1951).

This approach reflects several concerns. First, the common-law traditions of immunity for public officials could not have been repealed by the "general language" of § 1983. *Tenney* v. *Brandhove, supra,* at 376; see *Imbler* v. *Pachtman, supra,* at 421–424; *Pierson* v. *Ray,* 386 U. S. 547, 554–555 (1967). In addition, "the public interest requires decisions and action to enforce laws for the protection of the public." *Scheuer* v. *Rhodes,* 416 U. S. 232, 241 (1974). Because public officials will err at times, "[t]he concept of immunity assumes . . . that it is better to risk some error and possibly injury from such error than not to decide or act at all." *Id.,* at 242; see *Wood* v. *Strickland,* 420 U. S. 308, 319–320 (1975). By granting some immunity to governmental actors, the Court has attempted to ensure that public decisions will not be dominated by fears of liability for actions that may turn out to be unconstitutional. Public officials "cannot be expected to predict the future course of constitutional law. . . ." *Procunier* v. *Navarette,* 434 U. S. 555, 562 (1978).

In response to these considerations, the Court has found absolute immunity from § 1983 suits for state legislators, *Tenney* v. *Brandhove, supra,* judges, *Pierson* v. *Ray, supra,* at 553–555, and prosecutors in their role as advocates for the State, *Imbler* v. *Pachtman, supra.* Other officials have been granted a qualified immunity that protects them when in good faith they have implemented policies that reasonably were thought to be constitutional. This limited immunity extends to police officers, *Pierson* v. *Ray, supra,* at 555–558, state executive officers, *Scheuer* v. *Rhodes, supra,* local school board members, *Wood* v. *Strickland, supra,* the super-

intendent of a state hospital, *O'Connor* v. *Donaldson*, 422 U. S. 563, 576–577 (1975), and prison officials, *Procunier* v. *Navarette, supra.*

The Court today abandons any attempt to harmonize § 1983 with traditional tort law. It points out that municipal immunity may be abrogated by legislation. Thus, according to the Court, Congress "abolished" municipal immunity when it included municipalities "within the class of 'persons' subject to liability" under § 1983. *Ante,* at 647.

This reasoning flies in the face of our prior decisions under this statute. We have held repeatedly that "immunities 'well grounded in history and reason' [were not] abrogated 'by covert inclusion in the general language' of § 1983." *Imbler* v. *Pachtman, supra,* at 418, quoting *Tenney* v. *Brandhove, supra,* at 376. See *Scheuer* v. *Rhodes, supra,* at 243–244; *Pierson* v. *Ray, supra,* at 554. The peculiar nature of the Court's position emerges when the status of executive officers under § 1983 is compared with that of local governments. State and local executives are personally liable for bad-faith or unreasonable constitutional torts. Although Congress had the power to make those individuals liable for all such torts, this Court has refused to find an abrogation of traditional immunity in a statute that does not mention immunities. Yet the Court now views the enactment of § 1983 as a direct abolition of traditional municipal immunities. Unless the Court is overruling its previous immunity decisions, the silence in § 1983 must mean that the 42d Congress mutely accepted the immunity of executive officers, but silently rejected common-law municipal immunity. I find this interpretation of the statute singularly implausible.

### 2

Important public policies support the extension of qualified immunity to local governments. First, as recognized by the doctrine of separation of powers, some governmental decisions should be at least presumptively insulated from judicial re-

view. Mr. Chief Justice Marshall wrote in *Marbury* v. *Madison*, 1 Cranch 137, 170 (1803), that "[t]he province of the court is . . . not to inquire how the executive, or executive officers, perform duties in which they have a discretion." Marshall stressed the caution with which courts must approach "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive." The allocation of public resources and the operational policies of the government itself are activities that lie peculiarly within the competence of executive and legislative bodies. When charting those policies, a local official should not have to gauge his employer's possible liability under § 1983 if he incorrectly—though reasonably and in good faith—forecasts the course of constitutional law. Excessive judicial intrusion into such decisions can only distort municipal decisionmaking and discredit the courts. Qualified immunity would provide presumptive protection for discretionary acts, while still leaving the municipality liable for bad faith or unreasonable constitutional deprivations.

Because today's decision will inject constant consideration of § 1983 liability into local decisionmaking, it may restrict the independence of local governments and their ability to respond to the needs of their communities. Only this Term, we noted that the "point" of immunity under § 1983 "is to forestall an atmosphere of intimidation that would conflict with [officials'] resolve to perform their designated functions in a principled fashion." *Ferri* v. *Ackerman*, 444 U. S. 193, 203–204 (1979).

The Court now argues that local officials might modify their actions unduly if they face personal liability under § 1983, but that they are unlikely to do so when the locality itself will be held liable. *Ante*, at 655–656. This contention denigrates the sense of responsibility of municipal officers, and misunderstands the political process. Responsible local officials will be concerned about potential judgments against

their municipalities for alleged constitutional torts. Moreover, they will be accountable within the political system for subjecting the municipality to adverse judgments. If officials must look over their shoulders at strict municipal liability for unknowable constitutional deprivations, the resulting degree of governmental paralysis will be little different from that caused by fear of personal liability. Cf. *Wood* v. *Strickland,* 420 U. S., at 319–320; *Scheuer* v. *Rhodes,* 416 U. S., at 242.[9]

In addition, basic fairness requires a qualified immunity for municipalities. The good-faith defense recognized under § 1983 authorizes liability only when officials acted with malicious intent or when they "knew or should have known that their conduct violated the constitutional norm." *Procunier* v. *Navarette,* 434 U. S., at 562. The standard incorporates the idea that liability should not attach unless there was notice that a constitutional right was at risk. This idea applies to governmental entities and individual officials alike. Constitutional law is what the courts say it is, and—as demonstrated by today's decision and its precursor, *Monell*—even the most prescient lawyer would hesitate to give a firm opinion on matters not plainly settled. Municipalities, often acting in the utmost good faith, may not know or anticipate when their action or inaction will be deemed a constitutional violation.[10]

---

[9] The Court's argument is not only unpersuasive, but also is internally inconsistent. The Court contends that strict liability is necessary to "create an incentive for officials . . . to err on the side of protecting citizens' constitutional rights." *Ante,* at 651–652. Yet the Court later assures us that such liability will not distort municipal decisionmaking because "[t]he inhibiting effect is significantly reduced, if not eliminated, . . . when the threat of personal liability is removed." *Ante,* at 656. Thus, the Court apparently believes that strict municipal liability is needed to modify public policies, but will not have any impact on those policies anyway.

[10] The Court implies that unless municipalities are strictly liable under § 1983, constitutional law could be frozen "in its current state of development." *Ante,* at 651, n. 33. I find this a curious notion. This could be the first time that the period between 1961, when *Monroe* declared local

The Court nevertheless suggests that, as a matter of social justice, municipal corporations should be strictly liable even if they could not have known that a particular action would violate the Constitution. After all, the Court urges, local governments can "spread" the costs of any judgment across the local population. *Ante*, at 655. The Court neglects, however, the fact that many local governments lack the resources to withstand substantial unanticipated liability under § 1983. Even enthusiastic proponents of municipal liability have conceded that ruinous judgments under the statute could imperil local governments. *E. g.*, Note, Damage Remedies Against Municipalities for Constitutional Violations, 89 Harv. L. Rev. 922, 958 (1976).[11] By simplistically applying the theorems of welfare economics and ignoring the reality of municipal finance, the Court imposes strict liability on the level of government least able to bear it.[12] For some municipalities, the result could be a severe limitation on their ability to serve the public.

## B

The Court searches at length—and in vain—for legal authority to buttress its policy judgment. Despite its general statements to the contrary, the Court can find no support for its position in the debates on the civil rights legislation that included § 1983. Indeed, the legislative record suggests that

governments absolutely immune from § 1983 suits, and 1978, when *Monell* overruled *Monroe*, has been described as one of static constitutional standards.

[11] For example, in a recent case in Alaska, a jury awarded almost $500,000 to a policeman who was accused of "racism and brutality" and removed from duty without notice and an opportunity to be heard. *Wayson* v. *City of Fairbanks*, 22 ATLA L. Rep. 222 (Alaska Fourth Dist. Super. Ct. 1979).

[12] Ironically, the State and Federal Governments cannot be held liable for constitutional deprivations. The Federal Government has not waived its sovereign immunity against such claims, and the States are protected by the Eleventh Amendment.

the Members of the 42d Congress would have been dismayed by this ruling. Nor, despite its frequent citation of authorities that are only marginally relevant, can the Court rely on the traditional or current law of municipal tort liability. Both in the 19th century and now, courts and legislatures have recognized the importance of limiting the liability of local governments for official torts. Each of these conventional sources of law points to the need for qualified immunity for local governments.

### 1

The modern dispute over municipal liability under § 1983 has focused on the defeat of the Sherman amendment during the deliberations on the Civil Rights Act of 1871. *E. g., Monroe v. Pape,* 365 U. S., at 187–191; *Monell v. New York City Dept. of Social Services,* 436 U. S., at 664–683. Senator Sherman proposed that local governments be held vicariously liable for constitutional deprivations caused by riots within their boundaries. As originally drafted, the measure imposed liability even if municipal officials had no actual knowledge of the impending disturbance.[13] The amendment, which did not affect the part of the Civil Rights Act that we know as § 1983, was approved by the Senate but rejected by the House of Representatives. 436 U. S., at 666. After two revisions by Conference Committees, both Houses passed what is now codified as 42 U. S. C. § 1986. The final version applied not just to local governments but to all "persons," and it imposed no

---

[13] Cong. Globe, 42d Cong., 1st Sess., 663 (1871). The proposal applied to any property damage or personal injury caused "by any persons riotously and tumultuously assembled together; and if such offense was committed to deprive any person of any right conferred upon him by the Constitution and laws of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude. . . ." As revised by the first Conference Committee on the Civil Rights Act, the provision still required no showing of notice. *Id.,* at 749.

liability unless the defendant knew that a wrong was "about to be committed." [14]

Because Senator Sherman initially proposed strict municipal liability for constitutional torts, the discussion of his amendment offers an invaluable insight into the attitudes of his colleagues on the question now before the Court. Much of the resistance to the measure flowed from doubts as to Congress' power to impose vicarious liability on local governments. *Monell* v. *New York City Dept. of Social Services,* 436 U. S., at 673–683; *id.,* at 706 (POWELL, J., concurring). But opponents of the amendment made additional arguments that strongly support recognition of qualified municipal immunity under § 1983.

First, several legislators expressed trepidation that the proposal's strict liability approach could bankrupt local governments. They warned that liability under the proposal could bring municipalities "to a dead stop." Cong. Globe, 42d Cong., 1st Sess., 763 (1871) (Sen. Casserly). See *id.,* at 762 (Sen. Stevenson); *id.,* at 772 (Sen. Thurman). Representative Bingham argued that municipal liability might be so great under the measure as to deprive a community "of the means of administering justice." *Id.,* at 798. Some Congressmen argued that strict liability would inhibit the effective operation of municipal corporations. The possibility of liability, Representative Kerr insisted, could prevent local officials from exercising "necessary and customary functions." *Id.,* at 789. See *id.,* at 763 (Sen. Casserly); *id.,* at 808 (Rep. Garfield).

---

[14] The final Conference amendment stated:

"That any person or persons having knowledge that any of the wrongs . . . mentioned in the second section of this act, are about to be committed, and having power to prevent or aid in preventing the same, shall neglect or refuse to do so, and such wrongful act shall be committed, such person or persons shall be liable to the person injured or his legal representatives for all damages caused by any such wrongful act. . . ." *Id.,* at 819.

Most significant, the opponents objected to liability imposed without any showing that a municipality knew of an impending constitutional deprivation. Senator Sherman defended this feature of the amendment as a characteristic of riot Acts long in force in England and this country. *Id.,* at 760. But Senator Stevenson argued against creating "a corporate liability for personal injury which no prudence or foresight could have prevented." *Id.,* at 762. In the most thorough critique of the amendment, Senator Thurman carefully reviewed the riot Acts of Maryland and New York. He emphasized that those laws imposed liability only when a plaintiff proved that the local government had both notice of the impending injury and the power to prevent it. *Id.,* at 771.

> "Is not that right? Why make the county, or town, or parish liable when it had no reason whatsoever to anticipate that any such crime was about to be committed, and when it had no knowledge of the commission of the crime until after it was committed? What justice is there in that?" *Ibid.*

These concerns were echoed in the House of Representatives. Representative Kerr complained that "it is not required, before liability shall attach, that it shall be known that there was any intention to commit these crimes, so as to fasten liability justly upon the municipality." *Id.,* at 788. He denounced the "total and absolute absence of notice, constructive or implied, within any decent limits of law or reason," adding that the proposal "takes the property of one and gives it to another by mere force, without right, in the absence of guilt or knowledge, or the possibility of either." *Ibid.* Similarly, Representative Willard argued that liability "is only warranted when the community . . . has proved faithless to its duties. . . ." *Id.,* at 791. He criticized the absence of a requirement that it be "prov[ed] in court that there has been any default, any denial, any neglect on the part of

the county, city, town, or parish to give citizens the full protection of the laws." *Ibid.*

Partly in response to these objections, the amendment as finally enacted conditioned liability on a demonstration that the defendant knew that constitutional rights were about to be denied. Representative Poland introduced the new measure, noting that "any person *who has knowledge* of any of the offenses named . . . shall [have a] duty to use all reasonable diligence within his power to prevent it." *Id.,* at 804 (emphasis supplied). The same point was made by Representative Shellabarger, the sponsor of the entire Act and, with Representative Poland, a member of the Conference Committee that produced the final draft. *Id.,* at 804–805; see *id.,* at 807 (Rep. Garfield).

On the Senate side, one conferee stated that under the final version

> "in order to make the [municipal] corporation liable as a body it must appear in some way to the satisfaction of the jury that the officers of the corporation, those persons whose duty it was to repress tumult, if they could, had reasonable notice of the fact that there was a tumult, or was likely to be one, and neglected to take the necessary means to prevent it." *Id.,* at 821 (Sen. Edmunds).

Senator Sherman disliked the revised provision. He complained that "before you can make [a person] responsible you have got to show that they had knowledge that the specific wrongs upon the particular person were about to be wrought." *Ibid.*[15]

These objections to the Sherman amendment apply with equal force to strict municipal liability under § 1983. Just

---

[15] Under 42 U. S. C. § 1986, the current version of the language approved in place of the Sherman amendment, liability "is dependent on proof of actual knowledge by a defendant of the wrongful conduct. . . ." *Hampton* v. *Chicago,* 484 F. 2d 602, 610 (CA7 1973), cert. denied, 415 U. S. 917 (1974).

as the 42d Congress refused to hold municipalities vicariously liable for deprivations that could not be known beforehand, this Court should not hold those entities strictly liable for deprivations caused by actions that reasonably and in good faith were thought to be legal. The Court's approach today, like the Sherman amendment, could spawn onerous judgments against local governments and distort the decisions of officers who fear municipal liability for their actions. Congress' refusal to impose those burdens in 1871 surely undercuts any historical argument that federal judges should do so now.

The Court declares that its rejection of qualified immunity is "compelled" by the "legislative purpose" in enacting § 1983. *Ante,* at 650. One would expect powerful documentation to back up such a strong statement. Yet the Court notes only three features of the legislative history of the Civil Rights Act. Far from "compelling" the Court's strict liability approach, those features of the congressional record provide scant support for its position.

First, the Court reproduces statements by Congressmen attesting to the broad remedial scope of the law. *Ante,* at 636, and n. 17. In view of our many decisions recognizing the immunity of officers under § 1983, *supra,* at 666–667, those statements plainly shed no light on congressional intent with respect to immunity under the statute. Second, the Court cites Senator Stevenson's remark that frequently "a statutory liability has been created against municipal corporations for injuries resulting from a neglect of corporate duty." *Ante,* at 642–643, citing Cong. Globe, 42d Cong., 1st Sess., 762 (1871). The Senator merely stated the unobjectionable proposition that municipal immunity could be qualified or abolished by statute. This fragmentary observation provides no basis for the Court's version of the legislative history.

Finally, the Court emphasizes the lack of comment on municipal immunity when opponents of the bill did discuss the immunities of government officers. "Had there been a

similar common-law immunity for municipalities, the bill's opponents doubtless would have raised the spectre of its destruction, as well." *Ante,* at 643–644. This is but another example of the Court's continuing willingness to find meaning in silence. This example is particularly noteworthy because the very next sentence in the Court's opinion concedes: "To be sure, there were two doctrines that afforded municipal corporations some measure of protection from tort liability." *Ante,* at 644. Since the opponents of the Sherman amendment repeatedly expressed their conviction that strict municipal liability was unprecedented and unwise, the failure to recite the theories of municipal immunity is of no relevance here. In any event, that silence cannot contradict the many contemporary judicial decisions applying that immunity. See *infra,* at 677–678, and nn. 16, 17.

## 2

The Court's decision also runs counter to the common law in the 19th century, which recognized substantial tort immunity for municipal actions. *E. g.,* 2 J. Dillon, Law of Municipal Corporations §§ 753, 764, pp. 862–863; 875–876 (2d ed. 1873); W. Williams, Liability of Municipal Corporations for Tort 9, 16 (1901). Nineteenth-century courts generally held that municipal corporations were not liable for acts undertaken in their "governmental," as opposed to their "proprietary," capacity.[16] Most States now use other criteria

---

[16] In the leading case of *Bailey* v. *Mayor &c. of the City of New York,* 3 Hill 531, 539 (N. Y. 1842), the court distinguished between municipal powers "conferred for the benefit of the public" and those "made as well for the private emolument and advantage of the city. . . ." Because the injury in *Bailey* was caused by a water utility maintained for the exclusive benefit of the residents of New York City, the court found the municipality liable "as a private company." *Ibid.* This distinction was construed to provide local governments with immunity in actions alleging inadequate police protection, *Western College of Homeopathic Medicine* v. *Cleveland,* 12 Ohio St. 375 (1861), improper sewer construction, *Child* v.

for determining when a local government should be liable for damages. See *infra,* at 681–683. Still, the governmental/proprietary distinction retains significance because it was so widely accepted when § 1983 was enacted. It is inconceivable that a Congress thoroughly versed in current legal doctrines, see *Monell* v. *New York City Dept. of Social Services,* 436 U. S., at 669, would have intended through silence to create the strict liability regime now imagined by this Court.

More directly relevant to this case is the common-law distinction between the "discretionary" and "ministerial" duties of local governments. This Court wrote in *Harris* v. *District of Columbia,* 256 U. S. 650, 652 (1921): "[W]hen acting in good faith municipal corporations are not liable for the manner in which they exercise discretionary powers of a public or legislative character." See *Weightman* v. *The Corporation of Washington,* 1 Black 39, 49–50 (1862). The rationale for this immunity derives from the theory of separation of powers. In *Carr* v. *The Northern Liberties,* 35 Pa. 324, 329 (1860), the Pennsylvania Supreme Court explained why a local government was immune from recovery for damage caused by an inadequate town drainage plan.

> "[H]ow careful we must be that courts and juries do not encroach upon the functions committed to other public officers. It belongs to the province of town councils to direct the drainage of our towns, according to the best of their means and discretion, and we cannot directly or indirectly control them in either. No law allows us to substitute the judgment of a jury . . . for that of the representatives of the town itself, to whom the business is especially committed by law."

---

*Boston,* 86 Mass. 41 (1862), negligent highway maintenance, *Hewison* v. *New Haven,* 37 Conn. 475 (1871), and unsafe school buildings, *Hill* v. *Boston,* 122 Mass. 344 (1877).

That reasoning, frequently applied in the 19th century,[17] parallels the theory behind qualified immunity under § 1983. This Court has recognized the importance of preserving the autonomy of executive bodies entrusted with discretionary powers. *Scheuer* v. *Rhodes* held that executive officials who have broad responsibilities must enjoy a "range of discretion [that is] comparably broad." 416 U. S., at 247. Consequently, the immunity available under § 1983 varies directly with "the scope of discretion and responsibilities of the office. . . ." 416 U. S., at 247. Strict municipal liability can only undermine that discretion.[18]

---

[17] *E. g.*, *Goodrich* v. *Chicago*, 20 Ill. 445 (1858); *Logansport* v. *Wright*, 25 Ind. 512 (1865); *Mills* v. *Brooklyn*, 32 N. Y. 489, 498–499 (1865); *Wilson* v. *Mayor &c. of City of New York*, 1 Denio 595, 600–601 (N. Y. 1845); *Wheeler* v. *Cincinnati*, 19 Ohio St. 19 (1869) (*per curiam*); *Richmond* v. *Long's Adm'rs*, 17 Gratt. 375 (Va. 1867); *Kelley* v. *Milwaukee*, 18 Wis. 83 (1864).

[18] The Court cannot wish away these extensive municipal immunities. It quotes two 19th-century treatises as referring to municipal liability for some torts. *Ante*, at 640. Both passages, however, refer to exceptions to the existing immunity rules. The first treatise cited by the Court concedes, though deplores, the fact that many jurisdictions embraced the governmental/proprietary distinction. T. Shearman & A. Redfield, A Treatise on the Law of Negligence § 120, pp. 140–141 (1869). The same volume notes that local governments could not be sued for injury caused by discretionary acts, *id.*, § 127, at 154, or for officers' acts beyond the powers of the municipal corporation, *id.*, § 140, at 169. The Court's quotation from Dillon on Municipal Corporations stops just before that writer acknowledges that local governments are liable only for injury caused by nondiscretionary acts involving "corporate duties." 2 J. Dillon, Law of Municipal Corporations § 764, p. 875 (2d ed. 1873). That writer's full statement of municipal tort liability recognizes immunity for both governmental and discretionary acts. Dillon observes that municipal corporations may be held liable only *"where a duty is a corporate one,* that is, one which rests upon the municipality in respect of its special or local interests, and not as a public agency, *and is absolute and perfect,* and not discretionary or judicial in its nature. . . ." *Id.*, § 778, at 891 (emphasis in original).

The Court takes some solace in the absence in the 19th century of a

The lack of support for the Court's view of the common law is evident in its reliance on *Thayer* v. *Boston,* 36 Mass. 511 (1837), as its principal authority. *Ante,* at 641–642. *Thayer* did hold broadly that a city could be liable for the authorized acts of its officers. 36 Mass., at 516. But *Thayer* was limited severely by later Massachusetts decisions. *Bigelow* v. *Inhabitants of Randolph,* 80 Mass. 541, 544–545 (1860), ruled that *Thayer* applied only to situations involving official malfeasance—or wrongful, bad-faith actions—not to actions based on neglect or nonfeasance. See *Child* v. *Boston,* 86 Mass. 41 (1862); *Buttrick* v. *Lowell,* 83 Mass. 172 (1861). Finally, *Hill* v. *Boston,* 122 Mass. 344, 359 (1877), squarely repudiated the broad holding of *Thayer* and limited municipal liability to acts performed in the proprietary interest of the municipality.[19]

---

qualified immunity for local governments. *Ante,* at 644–650. That absence, of course, was due to the availability of absolute immunity for governmental and discretionary acts. There is no justification for discovering strict municipal liability in § 1983 when that statute was enacted against a background of extensive municipal immunity.

The Court also points out that municipalities were subject to suit for some statutory violations and neglect of contractual obligations imposed by State or Federal Constitutions. *Ante,* at 639–640. That amenability to suit is simply irrelevant to the immunity available in tort actions, which controls the immunity available under § 1983.

[19] The Court cites eight cases decided before 1871 as "reiterat[ing]" the principle announced in *Thayer* while awarding damages against municipalities for good-faith torts. Three of those cases involved the "special and peculiar" statutory liability of New England towns for highway maintenance, and are wholly irrelevant to the Court's argument. *Billings* v. *Worcester,* 102 Mass. 329, 332–333 (1869); *Horton* v. *Inhabitants of Ipswich,* 66 Mass. 488, 491 (1853) (trial court "read to the jury the provisions of the statutes prescribing the duties of towns to keep roads safe . . . and giving a remedy for injuries received from defects in highways"); *Elliot* v. *Concord,* 27 N. H. 204 (1853) (citing similar statute); see 2 J. Dillon, Law of Municipal Corporations § 1000, pp. 1013–1015, and n. 2 (3d ed. 1881). A fourth case, *Town Council of Akron* v. *McComb,* 18 Ohio 229 (1849), concerned damages caused by street-grading, and was later expressly restricted to those facts. *Western College of Homeopathic*

### 3

Today's decision also conflicts with the current law in 44 States and the District of Columbia. All of those jurisdictions provide municipal immunity at least analogous to a "good faith" defense against liability for constitutional torts. Thus, for municipalities in almost 90% of our jurisdictions, the Court creates broader liability for constitutional deprivations than for state-law torts.

---

*Medicine* v. *Cleveland,* 12 Ohio St., at 378–379. Two of the other cases cited by the Court involved the performance of ministerial acts that were widely recognized as giving rise to municipal liability. *Lee* v. *Village of Sandy Hill,* 40 N. Y. 442, 451 (1869) (liability for damage caused by street-opening when city was under a "duty" to open that street); *Hurley* v. *Town of Texas,* 20 Wis. 634 (1866) (improper tax collection). The seventh case presented malfeasance, or bad-faith acts, by the municipality's agents. *Hawks* v. *Inhabitants of Charlemont,* 107 Mass. 414 (1871) (city took material from plaintiff's land to repair bridge). Thus, despite any discussion of *Thayer* in the court opinions, seven of the eight decisions noted by the Court involved thoroughly unremarkable exceptions to municipal immunity as provided by statute or common law. They do not buttress the Court's theory of strict liability.

The Court also notes that Senator Stevenson mentioned *Thayer* during the debates on the Sherman amendment. *Ante,* at 642, and nn. 23, 24. That reference, however, came during a speech denouncing the Sherman amendment for imposing tort liability on municipal corporations. To reinforce his contention, Senator Stevenson read from the decision in *Prather* v. *Lexington,* 52 Ky. 559, 560–652 (1852), which cited *Thayer* for the general proposition that a municipal corporation is not liable on a *respondeat superior* basis for the unauthorized acts of its officers. Cong. Globe, 42d Cong., 1st Sess., 762 (1871). But the point of the passage in *Prather* read by Senator Stevenson—and the holding of that case—was that "no principle of law . . . subjects a municipal corporation to a responsibility for the safety of the property within its territorial limits." Cong. Globe, *supra,* quoting *Prather, supra,* at 561. So Stevenson cited *Prather* to demonstrate that municipalities should not be held vicariously liable for injuries caused within their boundaries. *Prather,* in turn, cited *Thayer* for a subsidiary point. Nowhere in this sequence is there any support for the Court's idea that local governments should be subjected to strict liability under § 1983.

Twelve States have laws creating municipal tort liability but barring damages for injuries caused by discretionary decisions or by the good-faith execution of a validly enacted, though unconstitutional, regulation.[20] Municipalities in those States have precisely the form of qualified immunity that this Court has granted to executive officials under § 1983. Another 11 States provide even broader immunity for local governments. Five of those have retained the governmental/proprietary distinction,[21] while Arkansas and South Dakota grant even broader protection for municipal corporations.[22] Statutes in four more States protect local governments from tort liability except for particular injuries not relevant to this case, such as those due to motor vehicle accidents or negligent maintenance of public facilities.[23] In

[20] Idaho Code § 6–904 (1) (1979); Ill. Rev. Stat., ch. 85, §§ 2–103, 2–109, 2–201, 2–203 (1977); Ind. Code §§ 34–4–16.5–3 (6), (8) (1976); 1979 Kan. Sess. Laws, ch. 186, § 4 (including specific exceptions to immunity); Mass. Gen. Laws Ann., ch. 258, §§ 10 (a), (b) (West Supp. 1979); Minn. Stat. §§ 466.03 (5), (6) (1978); Mont. Code Ann. §§ 2–9–103, 2–9–111, 2–9–112 (1979); Neb. Rev. Stat. §§ 23–2409 (1), (2) (1977); Nev. Rev. Stat. § 41.032 (1977); N. D. Cent. Code § 32–12.1–03 (3) (Supp. 1979); Okla. Stat., Tit. 51, §§ 155 (1)–(5) (Supp. 1979); Ore. Rev. Stat. §§ 30.265 (3)(c), (f) (1979).

The Federal Tort Claims Act provides a similar exemption for damages suits against the Federal Government. 28 U. S. C. § 2680 (a). The goal of that provision, according to this Court, is to protect this "discretion of the executive or the administrator to act according to one's judgment of the best course. . . ." Dalehite v. United States, 346 U. S. 15, 34 (1953).

[21] Mayor and City Council of Baltimore v. Seidel, 44 Md. App. 465, 409 A. 2d 747 (1980); Mich. Comp. Laws § 691.1407 (1970); Parks v. Long Beach, 372 So. 2d 253, 253–254 (Miss. 1979); Haas v. Hayslip, 51 Ohio St. 2d 135, 139, 364 N. E. 2d 1376, 1379 (1977); Virginia Electric & Power Co. v. Hampton Redevelopment & Housing Authority, 217 Va. 30, 34, 225 S. E. 2d 364, 368 (1976).

[22] Ark. Stat. Ann. § 12–2901 (1979); Shaw v. Mission, 88 S. D. 564, 225 N. W. 2d 593 (1975).

[23] 1977 N. M. Laws, ch. 386, §§ 4–9; Pa. Stat. Ann., Tit. 53, § 5311.202 (b) (Purdon Supp. 1979–1980); Wright v. North Charleston, 271 S. C.

682

Iowa, local governments are not liable for injuries caused by the execution with due care of any "officially enacted" statute or regulation.[24]

Sixteen States and the District of Columbia follow the traditional rule against recovery for damages imposed by discretionary decisions that are confided to particular officers or organs of government.[25] Indeed, the leading commentators on governmental tort liability have noted both the appropriateness and general acceptance of municipal immunity for discretionary acts. See Restatement (Second) of Torts § 895C (2) and Comment $g$ (1979); K. Davis, Administrative Law of the Seventies § 25.13 (1976); W. Prosser, Law of Torts 986–987 (4th ed. 1971). In four States, local governments enjoy complete immunity from tort actions unless they have taken out liability insurance.[26] Only five States

---

515, 516–518, 248 S. E. 2d 480, 481–482 (1978), see S. C. Code §§ 5–7–70, 15–77–230 (1976 and Supp. 1979); 1979 Wyo. Sess. Laws, ch. 157, § 1 (to be codified as Wyo. Stat. §§ 1–39–105 to 112).

[24] Iowa Code § 613A.4 (3) (1979).

[25] Cal. Gov't Code Ann. §§ 815.2, 820.2 (West 1966); *Tango* v. *New Haven*, 173 Conn. 203, 204–205, 377 A. 2d 284, 285 (1977); *Biloon's Electrical Serv., Inc.* v. *Wilmington*, 401 A. 2d 636, 639–640, 643 (Del. Super. 1979); *Spencer* v. *General Hospital of the District of Columbia*, 138 U. S. App. D. C. 48, 53, 425 F. 2d 479, 484 (1969) (en banc); *Commercial Carrier Corp.* v. *Indian River County*, 371 So. 2d 1010, 1020 (Fla. 1979); Ga. Code § 69–302 (1978); *Frankfort Variety, Inc.* v. *Frankfort*, 552 S. W. 2d 653 (Ky. 1977); Me. Rev. Stat. Ann., Tit. 14, § 8103 (2)(C) (Supp. 1965–1979); *Merrill* v. *City of Manchester*, 114 N. H. 722, 729, 332 A. 2d 378, 383 (1974); N. J. Stat. Ann. §§ 59:2–2 (b) and 59:2–3 (West Supp. 1979–1980); *Weiss* v. *Fote*, 7 N. Y. 2d 579, 585–586, 167 N. E. 2d 63, 65–66 (1960); *Calhoun* v. *Providence*, —— R. I. ——, 390 A. 2d 350, 355–356 (1978); Tenn. Code Ann. § 23–3311 (1) (Supp. 1979); Tex. Rev. Civ. Stat. Ann., Art. 6252–19, § 14 (7) (Vernon 1970); Utah Code Ann. § 63–30–10 (1) (1953); *King* v. *Seattle*, 84 Wash. 2d 239, 246, 525 P. 2d 228, 233 (1974) (en banc); Wis. Stat. § 895.43 (3) (1977).

[26] Colo. Rev. Stat. § 24–10–104 (1973); Mo. Rev. Stat. § 71.185 (1978); N. C. Gen. Stat. § 160A–485 (1976); Vt. Stat. Ann., Tit. 29, § 1403 (1970).

impose the kind of blanket liability constructed by the Court today.[27]

## C

The Court turns a blind eye to this overwhelming evidence that municipalities have enjoyed a qualified immunity and to the policy considerations that for the life of this Republic have justified its retention. This disregard of precedent and policy is especially unfortunate because suits under § 1983 typically implicate evolving constitutional standards. A good-faith defense is much more important for those actions than in those involving ordinary tort liability. The duty not to run over a pedestrian with a municipal bus is far less likely to change than is the rule as to what process, if any, is due the busdriver if he claims the right to a hearing after discharge.

The right of a discharged government employee to a "name clearing" hearing was not recognized until our decision in *Board of Regents* v. *Roth,* 408 U. S. 564 (1972). That ruling was handed down 10 weeks after Owen was discharged and 8 weeks after the city denied his request for a hearing. By stripping the city of any immunity, the Court punishes it for failing to predict our decision in *Roth.* As a result, local governments and their officials will face the unnerving prospect of crushing damages judgments whenever a policy valid under current law is later found to be unconstitutional. I can see no justice or wisdom in that outcome.

---

[27] Ala. Code § 11–47–190 (1975); *State* v. *Jennings,* 555 P. 2d 248, 251 (Alaska 1976); Ariz. Rev. Stat. Ann. § 11–981 (A)(2) (Supp. 1979–1980); La. Const., Art. 12, § 10 (A); *Long* v. *Weirton,* —— W. Va. ——, ——, 214 S. E. 2d 832, 859 (1975). It is difficult to determine precisely the tort liability rules for local governments in Hawaii.